**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael L. BERRIDGE, Defendant–
Appellant.**

No. 94–3845.

United States Court of Appeals,
Sixth Circuit.

Argued May 18, 1995.

Decided Jan. 25, 1996.

**114**

Randall E. Yontz (argued and briefed), Office of the U.S. Atty., Columbus, OH, for U.S.

G. Rand Smith (argued and briefed), G. Rand Smith Co., Columbus, OH, for Michael L. Berridge.

Before MILBURN and SILER, Circuit Judges; COOK,* Chief District Judge.

JULIAN ABELE COOK, Jr., Chief Judge.

The Defendant/Appellant, Michael Berridge, appeals the sentence by the district court following the acceptance of his guilty plea to violating 18 U.S.C. § 1014 (to wit, making false statements on a loan application). On appeal, he contends that the district court erroneously (1) calculated the amount in controversy, (2) increased his offense level under the United States Sentencing Guidelines (USSG) for a violation of a position of trust and engaging in more than minimal planning, (3) failed to reduce the offense level for his acceptance of responsibility, and (4) prohibited him from further employment in the banking industry. For the reasons that follow, we affirm.

**I**

In 1980, Berridge began his employment with the Ohio Valley Bank in Gallipolis, Ohio, as a collections manager. He was rapidly promoted within the loan department and eventually became the vice president of the Bank's retail lending division. During his employment, Berridge had access to loan application information and other bank records relating to loans.

The Government contends that Berridge began his clandestine criminal activity in Au-

---

* The Honorable Julian Abele Cook, Jr., Chief United States District Judge for the Eastern District of Michigan, sitting by designation.

gust 1982 when he authorized a "loan" to a fictitious customer, William R. Walters, for $3,000 without any collateral.[1] This single payment loan, which was ostensibly obtained to purchase farm equipment, was due on November 23, 1982 in the amount of $3,128.75. Prior to the date when the Walters debt was due, Berridge wrote a second loan in Walters' name, which paid off the initial $3,000 indebtedness plus interest and service charges, with a due date of February 22, 1983. This loan enabled the Bank to secure its loan with Walters' farm equipment.

On March 7, 1983, Berridge wrote a third loan to Walters which became due on July 7, 1983 and, once again, listed the farm machinery as collateral. This pattern continued until February 5, 1985 when a seventh loan to Walters in the amount of $4,756.01 was used to satisfy the obligations under the sixth loan. This final loan was never repaid. On August 5, 1985, the Bank conceded that the loan was uncollectible and wrote it off as a bad debt.

At a later time, the Bank learned that the social security number on Walters' loan applications belonged to a woman from Beaver Creek, Ohio, and the phone number had been assigned to an individual who had never heard of him. Correspondence that had been sent to Walters' listed address was returned to the Bank without delivery. According to the Government, Berridge illegally received $3,400 as a direct result of the Walters' loan, with a loss to the Bank of $5,477.73.

The Government asserts that Berridge applied this same repetitive unlawful scheme against the Bank on several other occasions when he used the names of Charles R. Tims (1982–1985; $5,586.65 Bank loss), Gregory Harvey (1983–1985; $4,269.23 Bank loss), Steven Myers (1984–1988; $6,787.49 Bank loss), and Eric Roberts (1984–1985; $3,173.45 Bank loss).

In addition, the Government maintains that Berridge authorized loans, all of which were used to pay off other fraudulent loans in the names of real and fictional Bank customers. As an example, the Government cites an August 30, 1985 loan to George R. Robinson in the amount of $1,750 which was allegedly used to purchase an automobile. Although this loan was paid off in June 1986, the Government contends that this was another fraudulent loan by Berridge because (1) the social security number on the loan security agreement belonged to a woman in Canton, Ohio, (2) the address was not valid, (3) the serial number of the vehicle was not listed on the loan agreement, and (4) no title was ever received by the Bank.

Utilizing the same technique that he had used with the Walters account, Berridge issued a loan to Henry L. Johnson, Jr. in May 1986. In August 1987, Berridge issued a third single payment loan in the amount of $8,877.20 with a due date of January 18, 1988. Although the loan had been delinquent for approximately 27 months, Berridge recorded it as having been "paid" on his report to the Bank's executive board. A fourth loan in Johnson's name was issued on April 21, 1990 for $11,886.79. When this account became delinquent for more than 120 days, the Bank's loan administration and collections officers questioned Berridge about some apparent irregularities on the account (i.e., Johnson's social security number belonged to a woman in Cleveland Ohio, and his "employer" denied that he had ever been an employee of the company). This loan was later repaid (in the amount of $13,257.39) by Berridge by using a blank security agreement without the knowledge of the legitimate Bank customer, Jack Swain, who had signed the document.

On August 13, 1986, Berridge issued a loan to Raymond L. Strait which was due to be paid in full on February 13, 1987. However,

---

1. The Government alleges that Berridge maintained a pattern of creating false loans that were made payable (in one payment) in full on a certain date. According to the Government, Berridge, in an effort to avoid the publication of these loans on the delinquent lists which were regularly reported to the Bank directors, would rewrite the note for the amount due plus interest.

This revision would produce a new due date on the single payment note, remove the loan from the delinquency report, and produce immediate cash to Berridge. The Government submits that virtually all of these bogus loans were subsequently written off by the unsuspecting Bank as an uncollectible debt.

the debt was fully satisfied on August 18, 1987 with a payment of $2,823.14. On the same day, Berridge extended a loan to Johnson in the amount of $4,823.14, a transaction which the Government asserts was used to pay off the Strait loan.[2]

Finally, Berridge is accused of inserting amounts onto legitimate loans by Bank customers and utilizing blank signed security agreements for purposes that were not authorized by the signatories. The funds from these transactions were deposited directly into Berridge's account. However, Berridge only acknowledges that he forged the loan application for Swain and added additional amounts to a loan with authorization of one of the Bank's legitimate customers, Fred Phillips.

On January 21, 1993, a federal grand jury returned a twenty-one count indictment against Berridge, charging him with bank fraud and specific instances of misapplication or embezzlement, false statements on loan applications, and misuse of a social security number. On August 9, 1993, the parties entered into an agreement in which Berridge consented to plead guilty to Counts 1 and 21.[3] However, the district court rejected their settlement proposal because Berridge did not accept full criminal responsibility for the material allegations within the two counts. Thereafter, the plea agreement was revised by the parties to substitute Counts 16–19 (i.e., making false statements on a loan application in violation of 18 U.S.C. § 1014) for Counts 1 and 21. Thereafter, the district court accepted his guilty plea and, thereafter, sentenced him to serve a period of 24 months in a federal correctional facility and, among other things, barred him from employment in the banking industry during his term of probation.

**2.** On March 31, 1992, Berridge acknowledged to an FBI case agent that Strait was a fictitious customer, and he had used the Bank loan to Strait to pay off other delinquent loans.

**3.** Count 1 was essentially a comprehensive overview of the alleged criminal activity, and Count 21 asserted Berridge's misuse of a social security number.

## II

In reviewing federal guideline sentences, the factual findings of the district court are reviewed on the basis of a clearly erroneous standard. *United States v. Garner*, 940 F.2d 172, 174 (6th Cir.1991). Where the applicability of an enhancement provision is contested, the Government bears the burden of establishing the enhancement factors by a preponderance of the evidence. *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir.1991). Moreover, in reviewing the issue of a defendant's acceptance of responsibility, the determination of the sentencing judge is entitled to great deference upon appellate review and should not be disturbed unless it is without foundation. *Id.* (citing U.S.S.G. § 3E1.1, Application Note 5).

### A

Berridge contends that the amount of loss for his relevant conduct should be limited to the four counts to which he pled guilty. Moreover, he submits that this amount should have been reduced by the district court to reflect the loan to Swain in the amount of $13,257.39 which had been used to pay off another loan.[4] Thus, Berridge submits that $30,000 is the more appropriate figure to be used.

Berridge's assertions are without merit. Under U.S.S.G. § 1B1.3(a)(2), the sentencing court may properly include "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." Moreover, "conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guidelines sentencing range." U.S.S.G. § 1B1.3 Comment (Background). *See also, United States v. Velez*, 1 F.3d 386, 389 (6th Cir.1993) (court is not constrained

**4.** In its Judgment, the district court discounted the amount of the Swain loan because of an assumption that it had already been counted as part of the loan to Henry Johnson. Berridge desires to take this reasoning one step further by claiming that, inasmuch as the Johnson loans are not part of the conduct for which he was found guilty, this sum of money should not have been considered by the district court.

by parties' stipulation to limit relevant conduct); *United States v. Smith,* 887 F.2d 104, 106–08 (6th Cir.1989). Notwithstanding Berridge's argument, the allegedly fraudulent loans, to which he neither acknowledged nor admitted culpability, were clearly a part of the same course of conduct. Accordingly, the amount used in the Presentence Report (to wit, $78,331.42 which represents the actual dollars for which the Bank could not account), was a permissible amount for the district court to consider at the time of the sentencing. *See* J.A. Vol. II (Under Seal) at 263–64.[5] However, the district court determined that the total loss to the Bank was $65,074.03 as the result of an erroneous deletion of the Swain loan which had already been excluded from the calculated amount. The Guidelines dictate that a court should add five levels for a loss between $40,001 and $70,000. U.S.S.G. § 2F1.1(b)(1). Because this amount falls within that range, the Guidelines mandate an increase of five levels.[6] Even if the district court had utilized the amount of Bank loss to which Berridge admits, the base offense level would have been the same. Thus, despite these incorrect calculations, the conclusions of the district court are correct and Berridge's argument on this issue must be rejected.

### B

Berridge challenges the conclusion of the district court that he held a position of trust at the Bank during the relevant periods of his criminal activity. Berridge specifically complains that the district court improperly added a total of four levels to the sentencing computation as the result of its conclusions that (1) the offense involved more than minimal planning, U.S.S.G. § 2F1.1(b)(2), and (2) he had abused his position of trust as an employee of the Bank, U.S.S.G. § 3B1.3.

Berridge claims that (1) his business decisions were supervised by the Bank's directors and officers and (2) he was required to attend routine meetings to answer questions pertaining to loan-related issues. Thus,

it is his position that this decision by the district court is flawed and contrary to the Comment to § 3B1.3 of the Sentencing Guidelines.

In support of his argument, Berridge cites *United States v. Ehrlich,* 902 F.2d 327 (5th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 851 (1991), in which the court determined that the accused loan clerk had abused her position of trust because she possessed (1) a specialized knowledge of the bank's electronic data systems, and (2) the authority to routinely initiate loan balancing transactions and handle large accounts, an assignment which was only assigned to those employees who were thought to be trustworthy and highly responsible. *Id.* at 331.

■ This argument must be rejected. It seems readily apparent that Berridge would not have been given the position, as well as the responsibilities, of a vice president if he had not been trusted by the directors and officers at the Bank. He had the authority to write off and grant loans, which was similar to the power that had been given to Ehrlich to shift funds between different accounts. Moreover, even the commentary in the Guidelines, to which Berridge refers in his argument, notes that this adjustment is applicable to "a bank executive's fraudulent loan scheme," but not to "embezzlement or theft by an ordinary bank teller...." Berridge was a bank executive in a position of trust, and the Government has shown that an enhancement for his abuse of a position of trust is warranted.

■ Berridge next asserts that he did not .plan the fraudulent conduct, contending that the acts of criminal activity in Counts 16–19 were spontaneously committed in response to suggestions by Fred Phillips to add $10,000 for his personal use to each of three loans that had been extended to him. Significantly, Berridge does not address the Swain loans that were obtained by him to pay off the delinquent loans. While the Swain

---

5. The Presentence Report did not incorporate the interest that remained due and owing on the accounts or the amounts which were used to pay off other outstanding loans.

6. The amount recommended in the Presentence Report would have increased the level by six. *Id.*

loans—standing alone—would be sufficient to uphold the decision by the district court to add two levels for more than minimal planning, there is a stronger basis for rejecting Berridge's argument. The background comments to U.S.S.G. § 2F1.1 state that independent of the actual harm, the extent to which an offense is planned is important in assessing its potential harmfulness. "A complex scheme or *repeated incidents of fraud are indicative of an intention and potential to do considerable harm.*" (Emphasis added). Here, Berridge has admitted that he committed repeated acts of fraud which clearly suggest the potential for committing a greater harm. Arguably, if Berridge had not been caught, he would have continued this illegal scheme indefinitely. Accordingly, the enhancement for more than minimal planning by the district court was proper.

■ Berridge next submits that the level enhancement for more than minimal planning and abuse of a position of trust amounts to double counting. He cites *United States v. Romano,* 970 F.2d 164 (6th Cir.1992), in which the Court found that an enhancement under § 3B1.1(a) of the Guidelines for an aggravating role and an enhancement under U.S.S.G. § 2F1.1(b)(2) for more than minimal planning constituted double counting. The Court reasoned that a defendant should not be penalized for the same conduct under two separate enhancement provisions of the Guidelines. *Id.* at 167. Applying this reasoning to the case before it, the Court stated that the conduct of organizing criminal activity by its very nature necessitates more than minimal planning. *Id.*

Berridge attempts to apply the *Romano* reasoning here when he asserts that U.S.S.G. § 2F1.1(b)(2)(A) encompasses U.S.S.G. § 3B1.3 because the acts of a person in a position of trust in more than minimally planning a crime is always an abuse of the position. Once again, Berridge's argument is without merit. In *Romano,* the court determined that having an aggravating role always encompassed more than minimal planning. In the case at bar, neither of the enhancement provisions necessarily encompasses the other. This is what Berridge

alleges with regard to his additions to the Phillips' loans. For example, one can abuse a position of trust with minimal planning. Similarly, an individual, such as a bank teller who embezzles money with an extensive plan, can engage in more than minimal planning without abusing a position of trust. Inasmuch as Berridge more than minimally planned the scheme, it does not follow that the one enhancement provision encompasses the other. Accordingly, the district court properly used both provisions to enhance the sentence range level.

## C

■ Berridge contends that he is entitled to a two level reduction under the acceptance of responsibility standard because of his cooperation in the investigation and admission of guilt to the crime. Berridge claims that the district court erroneously relied upon his testimony on cross examination wherein he stated that the money from Phillips was a gift. Berridge maintains that "under the pressure of cross-examination, any defendant will protest their innocence." (Brief at 18). Because the district court relied on Berridge's own testimony, there is no basis for a determination that its conclusion (to wit, that he did not fully accept responsibility for his actions) was in error.[7] Accordingly, the district court correctly denied a reduction for the acceptance of responsibility.

■ As a part of Berridge's sentence, Court prohibited him from obtaining employment in the banking industry during the period of his probation. He contends that the district court, in failing to state the reasons for the imposition of this portion of the sentence on the record, should be reversed. Conditions of supervised release or probation must be upheld if they are reasonably related to the goals of probation, rehabilitation of the defendant, and the protection of the public. *United States v. Bortels,* 962 F.2d 558, 560 (6th Cir.1992) (citation omitted). Moreover, 18 U.S.C. § 3553(c) requires the court to state the reasons for the imposition of a sentence outside the guideline range on the record. Although the reasons for the imposi-

---

**7.** There is no basis for Berridge's assertion that the district court judge was biased toward him.

tion of the contested condition of probation are relatively obvious in this case, Berridge correctly notes that the district court failed to set forth its reasons for the departure. If a sentence is imposed upon a defendant in violation of the law, the reviewing court must remand the case for further sentencing proceedings. 18 U.S.C. § 3742(f)(1).

However, the reasons for the imposition of the employment restriction upon Berridge in this case are quite clear. The prohibition, about which Berridge complains, will assist him in avoiding the conditions that led him to commit his current offense. Thus, although the district court failed to state its reasons on the record, this constitutes harmless error and does not necessitate a remand. Accordingly, this provision of Berridge's sentence is valid.

### III

For the reasons that have been set forth, the judgment of the district court is **AF-FIRMED**.