RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-5004

TOMMIE STEPP,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:09-cr-20134-2—Jon Phipps McCalla, Chief District Judge.

Decided and Filed: May 17, 2012

Before: KEITH, BOGGS, and MOORE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Doris Randle-Holt, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Memphis, Tennessee, for Appellant. Joseph C. Murphy, Jr., ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.

MOORE, J., delivered the opinion of the court, in which KEITH, J., joined.
BOGGS, J., concurred in the result only.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Tommie Stepp
("Stepp") appeals his conviction for one count of conspiracy to possess with intent to
distribute cocaine in violation of 21 U.S.C. § 846. Stepp entered a conditional plea of
guilty, reserving the right to appeal the denial of his motion to suppress evidence
obtained during the course of a traffic stop. Stepp now appeals the denial of his
suppression motion, arguing that evidence was obtained in violation of his Fourth and

1

Fifth Amendment rights and that the district court abused its discretion in preventing his expert from testifying at the suppression hearing. Stepp also appeals the imposition of a special condition of supervised release prohibiting him from obtaining full time work as a boxer upon his release from prison. For the following reasons, we **AFFIRM** the district court's denial of Stepp's motion to suppress and the district court's decision to exclude Stepp's expert from testifying at the suppression hearing. We **REVERSE** the district court's imposition of the special condition of supervised release and **REMAND** for resentencing without the improper condition that Stepp obtain and maintain employment outside the field of boxing.

## I. BACKGROUND

On April 16, 2009, Tommie Stepp and a co-defendant, Cedric Boswell, were driving west on Interstate 24 in a Hyundai Sonata in Rutherford County, Tennessee. Shortly after 8:45 a.m., they passed Deputy Lawson of the Rutherford County Sheriff's Department, who was parked in the median. R. 79 (Suppression Hr'g Tr. at 11). Deputy Lawson became suspicious of the Hyundai Sonata because it was a rental car. He followed the car and radioed for a license-plate check. The check revealed that the plate was not registered to a Sonata, but instead to a 2008 Chevrolet Express van. *Id.* at 15, 16. Deputy Lawson decided to initiate a traffic stop to investigate the plate mismatch, and as the car pulled over he also observed that the right rear brake light was not working. *Id.* at 18-19. The stop began at 8:53 a.m. *Id.* at 19.[1]

Deputy Lawson approached the Sonata, which was driven by Cedric Boswell, and explained that he had stopped them because the tag on the car came back for a Chevrolet van. He asked for identification, registration, and the rental agreement for the vehicle. *Id.* at 20, 59. Stepp and Boswell handed him their licenses and the vehicle's registration, which matched the description of the vehicle. *Id.* at 59-60. Deputy Lawson

---

[1]The video of the stop, recorded by Deputy Lawson's dashboard camera, shows Deputy Lawson approaching the Hyundai Sonata for the first time at 9:48:19. Everyone agrees that the time on the dashboard camera is wrong but that it correctly reflects the minutes that passed during the stop if not the precise time the events occurred. We will occasionally refer to both in an effort to pinpoint the amount of time that elapsed during the course of the stop.

testified that both parties appeared nervous and that their hands were shaking when they handed him their driver's licenses. *Id.* at 24, 84. Deputy Lawson observed Stepp, who was sitting in the passenger seat, clutching a "boost phone" in his hands. *Id.* at 20. This type of phone made Deputy Lawson suspicious because they are "commonly used in the criminal world [because] they're hard to track." *Id.* at 21. Neither Boswell nor Stepp could produce a rental agreement. At one point Boswell asked if he could check the trunk, opened it briefly, moved something aside, then shut the trunk. *Id.* at 20. Deputy Lawson asked Boswell if he was listed as an authorized driver on the rental agreement, which Boswell believed was in Stepp's name, and Boswell stated he did not believe he was. *Id.* at 21. Boswell returned to the driver's seat, and Deputy Lawson returned to his vehicle to conduct license checks on both Boswell and Stepp. *Id.* at 22-23. It was now approximately 8:55 a.m. *Id.* at 23.

The first criminal history check that Deputy Lawson ran returned a prior felony conviction for narcotics for Stepp. *Id.* at 22. The second database, which was more extensive, indicated that Boswell had previously been investigated by the DEA for trafficking cocaine. *Id.* at 24. While he was waiting for the results of these checks, Deputy Lawson called a backup officer for assistance. At some point the backup officer arrived, and Deputy Lawson testified that he instructed the backup officer to contact the rental-car company regarding the status of the vehicle and the DEA agent responsible for investigating Boswell. *Id.* at 25.

Thirteen minutes later, Deputy Lawson returned to the Sonata. R. 93 (Video at 9:49:40–10:02:41) (approximately 8:55 to 9:08 a.m.). Although he had not yet resolved the discrepancy relating to the license plate and the description of the vehicle, he informed Boswell that he would issue a warning ticket. Deputy Lawson asked Boswell to exit the vehicle so he could procure information necessary for the citation. R. 79 (Suppression Hr'g Tr. at 26). Deputy Lawson conducted a quick pat down of Boswell and began asking him questions and filling out the citation. R. 93 (Video at 10:03:13). Deputy Lawson testified that during his routine questioning, Boswell initiated conversation, offering that he was a boxer traveling from Atlanta to Nashville to train

in a gym. When Deputy Lawson asked him what gym, Boswell became nervous and could not provide the name. R. 79 (Suppression Hr'g Tr. at 26-27). At this point, Deputy Lawson testified that he had acquired reasonable suspicion that Boswell and Stepp were engaged in criminal activity based on the totality of the circumstances. *Id.* at 84. Deputy Lawson questioned Boswell for a total of four minutes, from approximately 9:08 to 9:12 a.m. R. 93 (Video at 10:03:13-10:07:05). During this conversation, Deputy Lawson explained that he was investigating secondary crimes and asked Boswell for consent to search the vehicle, and Boswell told him to ask Stepp.

At approximately 9:12 a.m., Deputy Lawson approached Stepp, who was still in the vehicle, asking him about their final destination. R. 93 (Video at 10:03:05). Stepp repeated the story about traveling to Nashville to train at a boxing gym, but also could not identify the gym by name or general location. R. 79 (Suppression Hr'g Tr. at 27-28). Deputy Lawson asked if he could search the car, and Stepp did not directly answer, stating they were in a hurry. *Id.*

Following this conversation, between 9:13 and 9:14 a.m., Deputy Lawson radioed for the K-9 unit to conduct a drug sniff of the vehicle. *Id.* at 24, 28 (citing Dispatch Log); R. 93 (Video at 10:07:51). The dog unit arrived at approximately 9:17 a.m.,[2] accompanied by Sergeant Edward L. Young. R. 93 (Video at 10:10:55). While waiting for the dog unit to arrive, Deputy Lawson continued to question Boswell. He also asked Stepp to exit the vehicle and took away his cell phone. Although Deputy Lawson testified that he had not yet completed his investigation of the license-plate mismatch, he did not testify that either he or the backup officer conducted any further investigation into that issue after the decision to call the K-9 unit was made at 9:14 a.m., nor does the video reflect any continuation of work on the citation during the three

---

[2]The district court states the canine unit arrived at 9:22 a.m. R. 92 (D. Ct. Order at 8). This is not supported by the record, including the video footage, which shows Deputy Lawson speaking on his radio at 10:07:51, which corresponds to approximately 9:14 a.m., and the canine arriving at 10:10:55, which would correspond to 9:17 a.m.

minutes that elapsed between the call and the dog's arrival.[3] The drug dog alerted to the presence of drugs while passing the driver's side door at 9:18 a.m.[4] R. 93 (Video at 10:11:26). Deputy Lawson then searched the vehicle and discovered two kilograms of cocaine hidden in a cookie box in the trunk.

At 9:19 a.m., immediately following the discovery of cocaine, Deputy Lawson read Boswell and Stepp their *Miranda* rights and placed them under arrest. R. 79 (Suppression Hr'g Tr. at 29-30); R. 93 (Video at 10:12:33). From the time that Boswell and Stepp were pulled over to the time they were arrested, a total of twenty-four minutes had elapsed. R. 93 (Video at 9:48:19-10:12:33). Stepp then gave a written statement and agreed to cooperate with the police by delivering the cocaine to the planned destination in Memphis, which he did.

Following his indictment for one count of conspiracy with the intent to distribute cocaine, in violation of 21 U.S.C. § 846, Stepp moved to suppress the evidence found in the Hyundai Sonata as taken in violation of his Fourth Amendment rights. The district court held a two-day evidentiary hearing, at which both Deputy Lawson and Officer Young were called by the government. Stepp then sought to call Samuel Kenneth Jones, Sr., ("Jones"), as "an expert in training dogs." R. 80 (Suppression Hr'g Tr. at 163). The government objected to Jones testifying and was permitted to cross-examine (voir dire) Jones on his qualifications. Jones testified that he had trained dogs for approximately fifty years, thirty of which were spent training dogs for various forms of police, military, and civilian work. *Id.* at 161-62. He admitted that he had trained only two or three dogs for drug work during his tenure as a trainer, the last of which was ten years before he

---

[3]At the suppression hearing, Deputy Lawson stated that he would not have released the men until he had made contact with the rental company, yet he was proceeding to write a warning ticket despite not knowing the results of that check. It was unclear whether the backup officer, who had been tasked with working on that as well as with contacting Boswell's DEA agent, ever attempted to call Budget or received results of any call. Deputy Lawson explained that once the dog alerted, the backup officer came over to assist.

[4]The government and the court also state the alert was on the trunk, but Officer Young stated the alert was at the driver's side door in his testimony. R. 80 (Suppression Hr'g Tr. at 121).

was called to testify. *Id.* at 164. He had no certifications in training drug dogs,[5] and he had never been a police dog handler. *Id.* at 165-66. The government then submitted that Jones was "not qualified to testify on drug dogs," and following brief re-direct, the district court sustained the government's objection. *Id.* at 167-68. The district judge then had a brief conversation with Jones regarding his background, during which Jones indicated that based on his experience, "from what I saw . . . that dog did not hit." *Id.* at 171. Counsel for the defendant was permitted to make an offer of proof that Jones would have testified that based on the behavior of the dog handler immediately prior to the alert and the dog immediately following the alert, "this dog was given a signal" by the officer, which led to the alert. *Id.* at 172-73.

The district court denied Stepp's motion to suppress. R. 92 (D. Ct. Order). Stepp then entered into a conditional-plea agreement with the government, changing his plea to guilty but reserving the right to appeal the district court's ruling on the suppression motion. The district court sentenced Stepp to thirty-seven months' imprisonment, the low point of his Guidelines range, and three years' supervised release. The district court imposed a special condition on Stepp's supervised release that Stepp obtain full-time employment outside of the field of boxing. Defense counsel did not object to the special condition at sentencing; however, following announcement of the sentence, the district court did not ask defense counsel if she had any further objections to the sentence not previously articulated. Stepp timely filed a notice of appeal.

## II. DENIAL OF MOTION TO SUPPRESS

On a motion to suppress, we review a district court's factual findings for clear error and the district court's legal conclusions de novo. *United States v. Lattner*, 385 F.3d 947, 952 (6th Cir. 2004), *cert. denied*, 543 U.S. 1095 (2005). Whether an officer had reasonable suspicion under the circumstances is a mixed question of law and fact that we review de novo. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir.), *cert.*

---

[5]Jones explained that he had no certifications because "my skills [are] so far advanced over all the people that I deal with that there is nobody that can give me a certificate for what I do." R. 80 (Suppression Hr'g Tr. at 167).

*denied*, 129 S. Ct. 2887 (2009).  Because the district court denied the motion to suppress, we weigh the evidence in the light most favorable to the government.  *Id.*

We review for abuse of discretion the district court's decision to admit or exclude evidence, whether at a suppression hearing or other proceeding.  *United States v. Lucas*, 357 F.3d 599, 608 (6th Cir. 2004); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (decision to admit or exclude expert testimony reviewed for abuse of discretion). "Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard." *Lucas*, 357 F.3d at 608 (internal quotation marks, omissions, and alterations omitted).

## A.  Fourth Amendment Claim

"Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment."  *Bell*, 555 F.3d at 539 (internal quotation marks omitted). Passengers, like Stepp, are also considered seized during a traffic stop.  *Brendlin v. California*, 551 U.S. 249, 263 (2007).[6]  We review the reasonableness of police conduct in effectuating a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Hill*, 195 F.3d 258, 263-64 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).  "In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop.  We first ask whether there was a proper basis for the stop."  *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted).  If the stop was proper, we ask "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  *Id.* (internal omissions and quotation marks omitted).

---

[6]Because passengers are seized during a traffic stop, any evidence subsequently obtained as the result of an unconstitutional seizure must be excluded.  *Brendlin*, 551 U.S. at 263.

Alternatively, the police may extend a stop beyond the scope of what was originally permissible if "something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *Id.* at 353 (internal quotation marks and alterations omitted). "[W]ithout such reasonable suspicion, all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (quoting *Hill*, 195 F.3d at 264).

The parties on appeal agree that Deputy Lawson's initial traffic stop of Boswell and Stepp was legal. Appellant Br. at 25; Appellee Br. at 19; R. 92 (D. Ct. Order at 12-13). Deputy Lawson had received information that the license plate for the Sonata belonged to a van, and the Sonata's brake light was not functioning. Each of these concerns formed a sufficient basis for Deputy Lawson to effectuate a traffic stop to ascertain whether the vehicle was in the proper possession of the driver, and to issue a citation for the brake-light violation.

Stepp argues that the traffic stop was unreasonably extended without separate reasonable suspicion when Deputy Lawson engaged in extraneous questioning of Boswell, thus requiring exclusion of all evidence thereafter obtained, including the fruits of the search. The district court held that the officers' actions were permissible both because they did not unreasonably extend the scope of the initial stop, and because they were independently supported by a reasonable suspicion that criminal activity was afoot. R. 92 (D. Ct. Order at 16-17). We examine each conclusion separately.

### 1. Scope of Initial Detention

An investigative detention is reasonable in scope if the detention was sufficiently limited in time and the investigative means used by the officers involve the least intrusive means reasonably available. *Davis*, 430 F.3d at 354. When the initial traffic stop has concluded, we have adopted a bright-line rule that any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop. *United States v. Everett*, 601 F.3d 484, 492 n.9 (6th Cir. 2010) (citing *United States v. Urrieta*, 520 F.3d 569, 578-79 (6th Cir. 2008)). Because a crafty officer, knowing this rule, may

simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, we also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure. *Id.* at 494. Unreasonable, however, does not include de minimis extensions. *Id.* at 493; *Bell*, 555 F.3d at 541-42 (holding slight deviations from initial purpose of stop to call for drug dog or to walk the dog around the vehicle do not require separate reasonable suspicion). Here, Stepp does not argue that the initial stop was ever completed and rightly so; Deputy Lawson had not completed the warning citation for the brake-light violation at the time the drugs were discovered. Rather, Stepp argues the stop was unreasonably prolonged by Deputy Lawson's extraneous questioning.[7]

"'An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.'" *Everett*, 601 F.3d at 490 (quoting *Arizona v. Johnson*, 555 U.S. 323 (2009)) (omission in original). A traffic stop is not "measurably" extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree. *Id.* at 492. We evaluate the reasonableness of the prolonging of a stop by considering the totality of the circumstances, which requires considering both the duration of the extraneous questioning and its subject matter. *Id.* at 494. With respect to subject matter, we observed that questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer "do not bespeak of a lack of diligence." *Id.* at 494-95.

Stepp argues the stop was unreasonably prolonged as soon as Boswell was asked to exit the vehicle and questioned by Deputy Lawson for four minutes. However, viewing the testimony in the light most favorable to the government, most of Deputy Lawson's questions were of the context-framing kind we deemed reasonable in *Everett*.

---

[7]Stepp also emphasizes that Deputy Lawson's motive for asking these questions was to ferret out information relating to secondary crimes. But as we noted in *Everett*, the officer's "subjective intent or hope to uncover unrelated criminal conduct is irrelevant." *Id.* at 495 n.12 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Deputy Lawson spoke to the driver about his authority to operate the vehicle, who owned it, where they were going, and where they were coming from. R. 79 (Suppression Hr'g Tr. at 27). We see nothing about the subject matter of these questions to suggest a lack of diligence on the part of the officers in conducting the initial traffic stop, even if they did prolong the stop longer than otherwise would have been necessary to complete the citation. Deputy Lawson also testified that he informed Boswell that he was investigating for secondary crimes and asked for consent to search the vehicle. This topic is, by Lawson's own admission, related to the investigation of a secondary crime and not the purposes of the initial stop.

We therefore turn to duration. Here, Deputy Lawson questioned Boswell for four minutes, and then proceeded to question Stepp for approximately two more. Because the video lacks sound, we have no indication of how many of those minutes were devoted to questions necessary to complete the citation and how many were extraneous. However, given Deputy Lawson's admission of some of the topics covered, and that two of those minutes were spent with Stepp and not on the citation, we do not doubt that a substantial portion of that time was devoted to the extraneous questions, some of which demonstrate less diligence than others. Consistent with our holding in *Everett*, our sister circuits have analyzed this type of mixed questioning by looking to the role that the extraneous questions played. *See United States v. Mason*, 628 F.3d 123, 132-33 (4th Cir. 2010) (eleven minutes of questioning was not unreasonable when only two minutes were spent on extraneous questions), *cert. denied*, 132 S. Ct. 329 (2011); *United States v. Macias*, 658 F.3d 509, 518-19 (5th Cir. 2011) (eleven minutes of questioning was unreasonable when many of the questions were unrelated to initial purpose of stop). Compared to the mere seconds in *Everett*, 601 F.3d at 495-96, we hold that six minutes of questioning measurably prolonged the traffic stop beyond its original purposes because the topics covered more than just context-framing questions and the extraneous questions lasted a not insubstantial amount of time.

Even if six minutes of extraneous questioning alone did not unreasonably prolong the search, the officer's subsequent actions undeniably did. Following his questioning

of Boswell and Stepp, Deputy Lawson called for a canine unit. The canine unit took another three and a half minutes to arrive and complete the subsequent walkaround. R. 93 (Video at 10:07:51-10:11:26). We analyze the involvement of a dog sniff at a traffic stop much the same way we analyze extraneous questioning. Generally, a dog sniff does not require separate reasonable suspicion because it is not a search under the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). If a dog sniff is conducted while someone is otherwise properly seized, such as in a lawful traffic stop, the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop. *Id.* at 407-08; *Bell*, 555 F.3d at 541.

The district court held that all of the down-time, including the time spent questioning Boswell and Stepp, should be discounted because the backup officer was reasonably investigating the license-plate mismatch during this time. In *Bell*, we held the use of a drug dog did not unreasonably extend the scope of the initial stop when the officers called the canine unit while waiting for the results of a license check, and the dog sniff itself occurred while one of the officers was writing the warning ticket for the initial infraction. *Bell*, 555 F.3d at 542. We find no factual support for the district court's finding, however, that during the down-time in this case the "backup officer investigated the vehicle registration violation." R. 92 (D. Ct. Order at 16). The backup officer was never identified and never testified. Deputy Lawson did not testify that he had any knowledge that the backup officer had spent the intervening down-time attempting to contact the rental-car company, only that he asked the backup officer to do so. R. 79 (at 25, 38, 75). This alone may have been enough to justify an inference in the government's favor had Deputy Lawson not testified that he also asked the backup officer to call Boswell's DEA agent. *Id.* at 25, 38. We know nothing more about how the backup officer spent his time. That the issue with the rental-car company was not resolved prior to the dog alert is not enough to establish that the officers were reasonably diligent in pursuing their investigation of the registration issue. We therefore hold that the delays in this case amounted to an unreasonable expansion of the initial stop. Thus, unless an independent reasonable suspicion of criminal activity arose during the course

of the conversation with Boswell, continuing to hold Stepp past that point amounted to a Fourth Amendment violation.

### 2.  Reasonable Suspicion of Criminal Activity

The district court also held that Deputy Lawson had a reasonable suspicion that criminal activity was afoot, which justified the prolonged detention of Stepp and Boswell to dispel his suspicions.  R. 92 (D. Ct. Order at 16).  On de novo review, we agree.

In deciding whether an officer conducting a traffic stop has developed a reasonable suspicion of criminal activity, we consider the totality of the circumstances. *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004).  The officer must point to "specific and articulable facts" that are "more than an ill-defined hunch." *Id.* (internal quotation marks omitted).  We review the evidence with a "common sense approach, as understood by those in the field of law enforcement." *Id.*

The district court made the following findings of facts based on the testimony at the suppression hearing, which combined to create reasonable suspicion that Stepp and Boswell were engaged in criminal activity:  (1) Stepp and Boswell appeared nervous when Deputy Lawson first approached the vehicle; (2) Stepp's and Boswell's hands were shaking when turning over their driver's licenses; (3) Stepp was pretending to be asleep at first, but had a tight grip on a "boost phone," which is commonly used in criminal enterprises, when Deputy Lawson approached the car; (4) neither defendant could produce a rental agreement; (5) when looking for the rental agreement, Boswell opened the trunk, moved something aside, then shut it again; (6) neither Boswell nor Stepp knew who owned the vehicle; (7) Boswell was not listed as an authorized driver of the rental car; (8) criminal history checks for both defendants revealed involvement in narcotics; and (9) Boswell spoke about traveling to visit a gym, but could not name the gym or its location. *See* R. 92 (D. Ct. Order at 15); *see also* R. 79 (Suppression Hr'g Tr. at 27, 84) (showing Deputy Lawson relied on all of these factors).  We review the district court's legal conclusion of reasonable suspicion de novo, but we review these fact findings for clear error.  *Townsend*, 305 F.3d at 541-42.

Stepp argues first that several of these factors are not supported by the record and therefore should not be considered in determining reasonable suspicion. For example, Stepp objects to the statement that he was feigning sleep when Deputy Lawson approached, but agrees that at a minimum Stepp was "taking a cat nap" when they were driving. Appellant Br. at 28. Stepp disputes the meaning of Boswell's statements that he was not authorized to drive the vehicle, correctly pointing out that Boswell's full statement was that he did not think he had been added to the rental agreement as an authorized driver. R. 79 (Suppression Hr'g Tr. at 21, 62). Finally, he challenges the fact that he had a criminal record in narcotics, but he does not dispute that Deputy Lawson received such information when he ran the initial check and also learned about Boswell's history during the check. We see no clear error in any of the district court's findings of fact; any slight variations appear to have been minimal.

Stepp also argues that the questioning of Boswell and Stepp was coercive, thereby creating a separate seizure. Appellant Br. at 32. Stepp is correct that police questioning during a lawful traffic stop may sometimes cross the line into coercion such that the individual being questioned is deemed "seized" independently of the traffic stop, *see Everett*, at 496, but his argument that he and Boswell were coercively questioned in this case lacks merit for several reasons. First, Stepp does not have standing to challenge the fruit of any unlawful seizure of just Boswell. *Alderman v. United States*, 394 U.S. 165, 174 (1969). Second, questions by an officer to an individual as part of a traffic stop are not per se coercive merely because the individual has been seized by submitting to the traffic stop. Stepp appears to be arguing that the answers to all questions asked by an officer during a traffic stop are not voluntary if the officer flashes his lights, takes the driver's license, and asks the driver to exit the vehicle to complete the ticket—acts we do not doubt are quite common in routine traffic stops. *See, e.g.*, *Bell*, 555 F.3d at 542 (asking driver to exit vehicle not a Fourth Amendment violation). Stepp has pointed to nothing in the record to suggest that the questions asked in this case were "any more coercive than a typical traffic stop." *Everett*, 601 F.3d at 496 (internal quotation marks omitted). We hold that Boswell's statements can be considered in determining whether Deputy Lawson had a reasonable suspicion of criminal activity.

The only issue remaining therefore is whether all these factors together amount to reasonable suspicion of separate criminal activity. "Although the reasonable-suspicion calculation examines the totality of the circumstances, even where the government points to several factors that this court has 'recognized as valid considerations in forming reasonable suspicion,' they may not together provide reasonable suspicion if 'they are all relatively minor and subject to significant qualification,' particularly where the 'case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases.'" *Bell*, 555 F.3d at 540 (quoting *Townsend*, 305 F.3d at 545) (internal omissions omitted); *see also United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (surveying cases). Although many of the government's factors when considered individually are weak indicators of criminal activity, when combined with the occupants' past history of narcotics activity and their vague travel plans, the totality of the circumstances supports the existence of reasonable suspicion. We discuss each factor in turn.

Factors one and two both relate to nervousness. We have held on numerous occasions, however, that nervousness is "an unreliable indicator, especially in the context of a traffic stop." *Richardson*, 385 F.3d at 630 (holding nervousness, confusing statements regarding travel plans, and the passenger's movement to the driver's seat insufficient to give rise to reasonable suspicion); *Bell*, 555 F.3d at 540 (giving nervousness little weight). These factors are therefore not strong indicators of criminal activity.

Factor three, feigned sleeping and clutching a phone, is also comparatively minor. Although Deputy Lawson explained why he believed these were indicators of criminal activity, they hardly seem strongly to suggest criminal activity.[8] We are not inclined to hold that a particular brand or model of cell phone is more suspicious than another, particularly when the "pay-as-you-go" feature is just as likely to attract those who cannot afford a monthly contract as it may be to attract drug couriers. *See*

---

[8]Although we accept the district court's finding that Lawson observed Stepp feigning sleep, we find it hard to understand how Deputy Lawson would know a passenger was feigning sleep and not actually asleep as the car drove by.

*Townsend*, 305 F.3d at 544 (unusual number of cell phones in car a relatively weak factor); *Bell*, 555 F.3d at 540 (holding cell phone relatively minor). These observations are therefore also weak indicators of criminal activity.

Factors four, six, and seven all relate to the fact that the car was a rental. The lack of a rental agreement gives us pause, but mostly because its presence would have quickly resolved the outstanding tag mismatch issue, not because its absence suggests criminal activity. Deputy Lawson at no point explained why a rental-car driver's failure to produce a rental agreement was more indicative of criminal activity than one who could produce an agreement. And the registration of the vehicle, which the defendants did produce, correctly matched the Hyundai Sonata they were in to the rental-car company. Although we do not doubt that drug couriers often drive other people's cars, and may commonly drive other people's rental cars, so called "third-party rentals," this factor is noticeably less suspicious when the owner or renter is present in the vehicle. *See Bell* 555 F.3d at 540 (lack of written permission to operate rental car minor factor); *United States v. Smith*, 263 F.3d 571, 592 (6th Cir. 2001) (lack of authorization not suspicious when wife was renter). Although these factors may contribute to reasonable suspicion, they are also comparatively weak.[9]

Factor five, that Boswell looked in the trunk briefly, if anything cuts against reasonable suspicion. The government suggests that Boswell quickly shut the trunk once he realized he had brought the officer close to the drugs, but the district court did not make this finding nor does the video show any particular speed or change of heart by Boswell when checking the trunk for the rental agreement. We do not see how an individual's willingness to show an officer the contents of his trunk is an indicator of criminal activity.

Skipping factor eight for a moment, we turn to factor nine, the recitation of vague travel plans. Although we often accord dubious travel plans less weight when the plans are confirmed by other members of the vehicle, *see Townsend*, 305 F.3d at 543 (late-

---

[9]We note that, in the past, the government has argued that the prompt presentation of a rental agreement should be seen as suspicious. *Smith*, 263 F.3d at 594.

night travel plans, even if odd, not substantially suspicious), we have at other times placed weight on implausible travel plans in considering whether reasonable suspicion has arisen, *see Hill*, 195 F.3d at 272 (inconsistent explanations for travel plans reasonable grounds for suspicion). Here, Boswell and Stepp both independently confirmed their destination as a gym in Nashville. However, unlike in *Townsend*, 305 F.3d at 543, where the occupants offered an explanation for their lack of knowledge and were still several hours away from their ultimate destination, Boswell and Stepp were stopped on an interstate just outside of Murfreesboro, TN, which is typically less than an hour outside of Nashville. Deputy Lawson also testified to observing a noticeable change in Boswell's behavior when Deputy Lawson asked him relatively basic follow-up questions. Although Boswell's and Stepp's inability to identify the precise name and location of the gym could be inconsequential in other circumstances, we find it more strongly indicative of criminal activity under the facts of this case.

That brings us to factor eight, Deputy Lawson's knowledge of the occupants' criminal histories. Deputy Lawson received information that Stepp had a prior felony conviction for narcotics[10] and that Boswell had previously been investigated by the DEA for trafficking cocaine. R. 79 (Suppression Hr'g Tr. at 22, 24). Our cases on the role of criminal history in the reasonable-suspicion calculus, as with other factors, often point in both directions. We have previously held that associating with a suspected drug dealer immediately prior to entering a vehicle substantially contributes to reasonable suspicion of a drug offense. *Davis*, 430 F.3d at 354-55. We have also held that prior drug violations contributed to the justification for extending someone's detention. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999). However, we have held that an officer's knowledge that a defendant has a criminal history is not enough to create reasonable suspicion, even when combined with other weaker indicators such as nervousness and illogical travel plans. *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003). In *Joshua*, the officer was not informed of

---

[10]Whether Stepp's conviction was ultimately shown to be an error is irrelevant to whether Deputy Lawson had reasonable suspicion during the traffic stop, provided he had no reason to doubt the veracity of the report at that time.

the subject of the prior criminal history, just that the driver had one. *Id.* at 454 (Clay, J., concurring). Furthermore, the officer was not informed of the history until well after the stop had been unreasonably extended. *Id.* at 446.

Here, the criminal history reports on Stepp and Boswell were specific and related to the same suspicions that the officer was developing—that the occupants of the vehicle might be involved in drug trafficking. "Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (knowledge of specific history in drug trafficking weighed in favor of reasonable suspicion); *see also Townsend*, 305 F.3d at 544-45 (prior record of weapons charges justified a brief search for weapons, even though not contributing to other suspicions). We agree that the specific nature of Stepp's and Boswell's criminal histories—involvement with narcotics—casts a suspicious light on the otherwise weaker indicators, particularly when combined with the dubious travel plans.

Here, the totality of the circumstances demonstrates a reasonable suspicion that criminal activity was afoot. The expansion of the initial stop in order to question Stepp and Boswell further and to accommodate the dog sniff was therefore not a second seizure, because such actions were supported by separate reasonable suspicion of criminal activity.

## B.  Fifth Amendment Claim

Stepp argues that the district court failed to suppress the statement made by Stepp following his arrest in violation of the Fifth Amendment. His argument, however, is more accurately pursuant to the Fourth Amendment, because he seeks the exclusion of his statements based solely on their being the fruits of an unlawful search and seizure. Appellant Br. at 43-47. We hold that none of Stepp's statements were the fruit of an unlawful search or seizure, because there was no unlawful search or seizure in this case. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

**C. Admissibility of Expert Testimony Claim**

Stepp argues that the district court abused its discretion in excluding his expert's testimony at the suppression hearing. The government maintains there was no error because district judges are not bound by the Federal Rules of Evidence at suppression hearings, or by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and can choose to admit or exclude evidence in their discretion.[11]

Federal Rule of Evidence 104(a) (2000) explicitly provides that the Rules of Evidence do not apply when the district court is making a determination on the admissibility of evidence. *See also* Fed. R. Evid. 1101(d)(1) (2000) (deeming Rules of Evidence inapplicable when deciding fact issues relating to admissibility of evidence under Fed. R. Evid. 104(a)). The Rules of Evidence are inapplicable as well to the admission of evidence presented at suppression hearings. *United States v. Matlock*, 415 U.S. 164, 172-73 (1974) ("[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."); *see also United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir.) (affirming admission of hearsay evidence at suppression hearing) (citing *United States v. Lee*, 541 F.2d 1145, 1146 (5th Cir. 1976) (reversing exclusion of evidence at suppression hearing when based on grounds that it was hearsay)), *cert. denied*, 442 U.S. 933 (1979). The Supreme Court held in *Matlock* that it was error for the district court to exclude otherwise reliable evidence on the basis of the Rules of Evidence. The Supreme Court even suggested that at suppression hearings, "the exclusionary rules, aside from rules of privilege, should not be applicable; and the

---

[11]As an initial matter, passengers typically do not have standing to challenge the probable cause to search a vehicle, assuming that the passenger's seizure was otherwise lawful. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). However, the parties do not appear to dispute Stepp's standing, perhaps in light of Deputy Lawson's testimony that Boswell indicated that Stepp was the renter of the vehicle. Because that would arguably confer standing on Stepp, and we see no reason to challenge sua sponte the parties' position on this matter, we will address Stepp's arguments relating to the search. *See United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988) (passenger in rental car lacked standing because neither paid for rental nor an authorized driver), *cert. denied*, 493 U.S. 1090 (1990).

judge should receive the evidence and give it such weight as his judgment and experience counsel." *Matlock*, 415 U.S. at 175.

Even at a suppression hearing, however, a trial court's findings must be "supported by competent and credible evidence." *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001). A district judge has the discretion to place limits on a witness's testimony during a suppression hearing in order to facilitate the examination of the relevant evidence. *See United States v. Stanley*, 351 F. App'x 69, 74 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 2364 (2010). However, the very reason for suspending the Rules of Evidence in such hearings in the first place is to allow the impartial judge, who is less prone to persuasion by misleading expert testimony than a jury, to weigh the competing evidence offered by the parties. *Cf. Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir.) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."), *cert. denied*, 546 U.S. 936 (2004). Whether a proffered expert should be permitted to testify at all at a suppression hearing is therefore distinct from the ultimate question of whether the testimony is sufficiently credible to serve as a basis for the district court's conclusions. At a suppression hearing, we would expect the district court to err on the side of considering more, not less, information, particularly on an issue for which the other party has offered competing expert testimony.

We have not yet expressed a position on whether Rule 702 or *Daubert* play any role in suppression hearings, or if not, what standards a district court should use in determining whether a party should be permitted to present expert testimony. We find informative the discussion of this issue by our sister circuit in *United States v. Ozuna*, 561 F.3d 728, 736-37 (7th Cir.), *cert. denied*, 130 S. Ct. 1685 (2009). In *Ozuna*, the Seventh Circuit declined to impose on district courts an additional requirement of conducting a *Daubert* analysis before considering expert testimony at evidentiary hearings. Noting that the Rules of Evidence were generally inapplicable at such hearings, the court held that nothing in *Daubert*'s stated rationale would be furthered by requiring a judge to apply *Daubert* before hearing expert testimony at a suppression

hearing. The district court did not err in hearing the purported expert testimony, weighing its reliability, and then choosing to credit parts of it but not all. We agree with this approach. Even at a suppression hearing, the district court must always consider any proffered expert's qualifications and determine, in its discretion, what weight to afford that expert's testimony. *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). This determination, however, will typically follow the presentation of an expert's testimony, rather than precede it.

Here, the district court did not appear to conduct an analysis under Rule 702 or *Daubert* when ruling to exclude Jones's testimony. However, the district court's statements suggest that it did not believe it had the discretion even to consider Jones's testimony. Following direct and voir dire of Jones's qualifications, the district court stated: "I listened carefully to the material submitted, and it does not appear that the witness is qualified to testify regarding drug dogs. . . . [B]ased on the information I have got . . . *I could not receive any testimony* in this area." R. 80 (Suppression Hr'g Tr. at 168-69) (emphasis added). The district court added that "it is up to the party presenting the witness to show that they're qualified and that their testimony can be helpful to the decider of fact in an issue that is before the court, and that was not demonstrated in this matter." *Id.* at 169. Thus, on this record, we must hold that the district court abused its discretion in excluding Jones, not because he was qualified to render opinions in this area, but because the district court improperly held itself to an erroneous standard when deciding whether it could hear his testimony in the first place. *See Matlock*, 415 U.S. at 172-73 (holding error to exclude evidence based on Rules of Evidence); *Lee*, 541 F.2d at 1146 (same); *Lucas*, 357 F.3d at 608 (abuse of discretion to apply wrong law).

Nonetheless, we do not believe this error warrants reversal in this case. Expert testimony regarding a dog alert undeniably has potential relevance at a suppression hearing, during which the district court must determine whether a dog's alert established probable cause to search a vehicle. We have previously held that a defendant may be entitled to funds for the procurement of an expert in dog-sniff cases. *United States v. Howard*, 621 F.3d 433, 448 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1623 (2011).

Because a "'positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance,'" a defendant who sufficiently puts at issue the drug dog's health, certification, training and performance, or presence of an alert may be entitled to an expert to attack a finding of probable cause. *Id.* at 447 (quoting *Diaz*, 25 F.3d at 393-94). Here, unlike in *Howard*, Stepp has affirmatively argued that the circumstances under which the drug dog alerted were suspicious, proffering that his expert would demonstrate that the dog's alert was the product of a signal from the officer, not his training to react upon the detection of narcotics.[12] Nevertheless, just because a defendant may be entitled to funding for expert services does not mean that the defendant's chosen expert has a credible opinion on the subject.

The record here sufficiently establishes that even had the district court permitted Jones to testify, Jones's opinion would not have constituted the "competent and credible evidence" on which we expect district courts to rely. *Fields*, 275 F.3d at 485 n.5. Jones was questioned at length about his background, demonstrating that he lacked the necessary qualifications to offer even minimally credible or reliable testimony on the subject of dogs sniffing for narcotics. Jones admitted to having trained only two or three drug dogs in the course of a fifty-year career, the last of which was ten years before the hearing. R. 80 (Suppression Hr'g Tr. at 164). He was not, nor had he ever been, a police-dog handler. He had no certification on narcotics-dog training. Furthermore, any prejudice in erroneously preventing him from testifying was minimized by the fact that his ultimate conclusions and an abbreviated explanation were offered both by Jones and counsel for the defendant in an offer of proof. The dog handler, Officer Young, had already credibly testified at length regarding the training of the dog involved in this case and how the dog had alerted (sitting down near the driver's door). Had the district court applied the correct standard, we believe that the district court in its discretion would have permissibly taken the same actions of rejecting the content of Jones's proffered testimony in favor of the highly credible evidence offered by the government's expert

---

[12]Stepp does not explicitly link his expert's testimony to refuting the finding of probable cause to search as a result of the alert, focusing instead on the need for his expert to help the judge in "understanding the evidence." Appellant Br. at 51.

in this area. Nor do we believe, had Jones testified in accordance with the proffer, that the district court's holding that probable cause was established would have changed when weighed against the testimony of Officer Young. *See Diaz*, 25 F.3d at 395 (affirming finding of dog's reliability following district court's consideration of competing expert testimony). Given the unusual circumstances of this case, we find the district court's error to be harmless.

### III.  SPECIAL CONDITION OF SUPERVISED RELEASE

During sentencing, the district court imposed a special condition of supervised release that Stepp "seek and maintain full-time employment outside the field of boxing." R. 173 (Sentencing Hr'g Tr. at 28); *see also* R. 163 (Judgment at 4) (same). Although Stepp failed to object to this condition at sentencing, the government concedes that the argument was not forfeited because the district court did not ask the defendant if he had any objections that had not already been raised following the pronouncement of his sentence. *See* Appellee Br. at 28; *United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006) (citing *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004)), *cert. denied*, 552 U.S. 965 (2007).[13] We therefore review the reasonableness of the special condition for abuse of discretion. *United States v. Brogdon*, 503 F.3d 555, 563 (6th Cir. 2007); *United States v. Inman*, 666 F.3d 1001, 1004 (6th Cir. 2012).

District courts are permitted to impose any special conditions of supervised release they deem reasonably related to the enumerated sentencing factors. 18 U.S.C. § 3583(d).  As with other sentencing conditions, we conduct inquiries into both procedural and substantive reasonableness when reviewing special conditions. On the procedural side, we ask "whether the district court adequately stated in open court at the time of sentencing its rationale for mandating special conditions of supervised release." *Brogdon*, 503 F.3d at 563 (internal quotation marks omitted). The substantive inquiry asks "whether the condition of supervised release is reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public." *Id.*

---

[13]After imposing Stepp's sentence, the district court asked if the defendant had anything else, to which the defendant's counsel responded no. R. 173 (Sentencing Hr'g Tr. at 34).

Any conditions imposed "must involve no greater deprivation of liberty than is reasonably necessary for the sentencing purposes and must be consistent with any pertinent policy statements issued by the Sentencing Commission. *Id.* at 564.

The Sentencing Guidelines explicitly permit the district court to prohibit the defendant from engaging in certain occupations upon release if the district court determines both (1) that "a reasonably direct relationship existed between the defendant's occupation . . . and the conduct relevant to the offense of conviction," and (2) that "imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. §§ 5F1.5(a)(1), (2). We have upheld occupational restrictions where the facts of the case demonstrate a connection between the crime and the occupation. *See United States v. May*, 568 F.3d 597, 607-08 (6th Cir. 2009) (financial-services employee who embezzled could be banned from obtaining employment with financial-services industry); *United States v. Berridge*, 74 F.3d 113, 118-19 (6th Cir. 1996) (banker who made false statements on loan applications could be banned from seeking work in the banking industry); *United States v. Peete*, 919 F.2d 1168, 1181 (6th Cir. 1990) (city councilman who took bribes could be banned from seeking elected office during probationary period).

Here, the district court discussed on the record his reasons for imposing the special condition limiting employment. *See* R. 173 (Sentencing Hr'g Tr. at 28). The district court noted the defendant's age and the difficulties of competing in a sport as one gets older, stating "it is time to move on" and "you really need to go ahead and move past it."[14] *Id.* At no point did the district court address the relationship between boxing

---

[14]The district court imposed the special condition without request from either party. The government had used Stepp's age (born in 1970) and likely inability to find work boxing to justify its request that he obtain vocational skills while serving any prison sentence. R. 173 (Sentencing Hr'g Tr. at 8). The only special condition of supervised release that the government sought was that Stepp "be required to seek and maintain employment." *Id.* at 10. Counsel for the defendant argued that because he was trained as a boxer, he would not need a lengthier sentence to ensure job training, as he could help deter young children from crime when he was released. *Id.* at 13. The district judge disagreed, stating that such arguments ignore "the true necessity of obtaining a skill that will give you a life of meaningful employment." *Id.*

and the instant offense, nor did the court address the reason why banning Stepp from boxing would better protect the public.

On appeal, the government tries to fill the void by suggesting that boxing was linked to the crime because Stepp and Boswell referenced boxing as the purpose of their travels. Appellee Br. at 29. We disagree that such statements sufficiently connect boxing to the underlying narcotics offense or otherwise establish that such a restriction is necessary to protect the community from the defendant's potential return to drug trafficking. *See United States v. Erwin*, 299 F.3d 1230, 1232-33 (10th Cir. 2002) (commercial fisherman could not be banned from commercial fishing based solely on conviction for unlawful possession of ammunition). We see no reason to believe that banning Stepp from boxing specifically will prevent him from engaging in unlawful conduct similar to that for which he was convicted.

The district court's justification appears to be solely that Stepp was too old to maintain full-time work boxing, rather than any relationship between boxing and drug trafficking. Because this is not a valid reason for imposing an occupational restriction, we hold that the district court abused its discretion in imposing the special condition. Stepp may be required to obtain full-time employment upon release, but he may satisfy that condition in whatever law-abiding profession he desires.

## IV. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's denial of Stepp's suppression motion, we **REVERSE** the district court's imposition of a special condition of supervised release that he obtain and maintain employment outside the field of boxing, and we **REMAND** for resentencing without the improper special condition.