RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 20-1955

DANTE DEVON WHITLEY,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00296-1—Paul Lewis Maloney, District Judge.

Argued: April 27, 2022

Decided and Filed: May 18, 2022

Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Matthew N. Ball, GIBSON DUNN & CRUTCHER, LLP, Denver, Colorado, for Appellant. Jennifer Lee McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Matthew N. Ball, GIBSON DUNN & CRUTCHER, LLP, Denver, Colorado, for Appellant. Kristin M. Pinkston, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. Dante Devon Whitley was the subject of a traffic stop for failing to come to a standstill before exiting a private drive onto a public street.

Prior to pulling Whitley over, law-enforcement officers had been surveilling Whitley for suspected drug trafficking. During the stop, the officers noticed a digital scale sitting on Whitley's lap. They asked Whitley to exit the vehicle so that they could further investigate the scale. Whitley initially refused, but he eventually complied after his mother arrived. At that point, a drug-detection dog was brought on the scene and alerted to the presence of narcotics in Whitley's vehicle. The officers then conducted a warrantless search. In the vehicle, they found a Glock 19mm handgun with an extended magazine, ammunition, over $7,600 in cash, a digital scale, and a pound and a half of marijuana.

Whitley moved to suppress this evidence, as well as several post-*Miranda* statements that he made, as fruits of an unlawful stop and search. The district court denied the motion. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

**A. Factual background**

On September 25, 2019, Detective Jeffrey Woollam set up surveillance of a residence located at 5828 Ridgebrook Avenue in Kentwood, Michigan after receiving a tip from a confidential informant about activity concerning the sale of heroin from that location. Detective Woollam saw Whitley leave the surveilled residence and walk to a red car. According to Detective Woollam, Whitley was "looking at a large bundle or sum of cash in his hand as if he was counting it as he walked out to the vehicle."

Whitley then embarked on a trip that included multiple stops. He drove away from the residence, and Detective Woollam followed in an unmarked car. Detective Woollam saw Whitley pull into a driveway of a house down the street and meet with another man for 20 to 25 seconds. After the brief meeting, Whitley traveled to a nearby Family Dollar. Detective Woollam's partner in the Special Investigations Unit, Detective Scott Drumm, met Detective Woollam at the Family Dollar to assist with the surveillance. Whitley exited the Family Dollar without any purchases, took a black bag out of the passenger side of the vehicle, and placed it in the trunk. As Whitley drove out of the parking lot and pulled onto the street, he failed to stop in accordance with the state traffic laws.

Whitley proceeded to a Mother Hubbard Liquor Store. Detectives Drumm and Woollam followed. Whitley walked into the store briefly and left without any packages. When Whitley exited the private drive of the Mother Hubbard, he again failed to stop.

Detective Woollam then called Officer Turmell, a patrol officer in the area. He communicated to Officer Turmell that there was probable cause for a traffic stop based on Whitley's traffic violations, and that he suspected Whitley of being engaged in a narcotics-related offense. Detective Woollam also requested the presence of a drug-detection dog because of the suspected drug trafficking.

Officer Turmell pulled Whitley over at 7:44 p.m. Detective Woollam was driving behind Officer Turmell when the stop occurred. As Officer Turmell made contact with Whitley, Detective Woollam parked and stood behind Officer Turmell's patrol vehicle so that Whitley would not see his plainclothes presence.

Officer Turmell explained to Whitley that he had stopped Whitley because Whitley had failed to make a complete stop when exiting two private drives. He asked Whitley to produce his identification, automobile registration, and proof of insurance. While waiting for the documents, Officer Turmell asked whether Whitley had anything illegal in the vehicle. Whitley stated that he did not. After Whitley handed the requested documents to Officer Turmell, the officer noticed a scale in Whitley's lap and asked why it was there. Whitley stated that he smokes weed, did not have any, and was on his way to get some.

Officer Turmell told Whitley that he would be right back. He proceeded to tell Detective Woollam that Whitley had a scale "right there" on his lap. This prompted Detective Woollam to say that they should pull Whitley out of the vehicle. Officer Turmell returned to the vehicle and asked Whitley to step out for him. Whitley responded by saying "what?" Officer Turmell replied that they wanted to "investigate the scale real quick." He further explained that Whitley was not presently under arrest, but that they needed "to have a conversation." When Whitley did not exit the vehicle, Detective Woollam approached the passenger side window and told Whitley that he was now under arrest.

Whitley continued to refuse to get out of the vehicle. He stated that he needed to call his lawyer and that he had not done anything illegal. When Whitley stated that he would call his lawyer, Detective Woollam asked if he needed to make this call because he had "something." Officer Turmell then noted that Whitley had marijuana "shake" (residue) in the vehicle. Whitley pointed out that marijuana is legal in Michigan. Officer Turmell responded that Whitley was "also hindering [his] investigation by not coming out" of the vehicle and that Whitley "would be under arrest for that too."

As the officers were ordering Whitley to exit the vehicle, Detective Woollam explained to Whitley that they "stopped [him] for a valid reason and then [they] saw drug paraphernalia in [his] lap," so he was "not free to leave." When Whitley continued to refuse to get out, Detective Woollam repeated that he was being told to exit the vehicle because he had "digital scales in [his] lap," which constitutes "possession of drug paraphernalia." Detective Woollam also proclaimed that Whitley could not be smoking weed and driving his vehicle, to which Whitley asked: "When was I smoking?" Whitley insisted that he had not been smoking in his vehicle.

Over the next seven minutes, Whitley continued to refuse to get out of the vehicle, explaining that he wanted to wait until his mother got there. Whitley finally exited the vehicle when his mother arrived, which was about twenty minutes after he was initially pulled over. He was arrested for "hindering" and "opposing" the officers' investigation.

After Whitley was taken into custody, the canine unit was deployed. The "K-9 narcotics sniff" revealed a "large[,] sealed baggy that had marijuana residue in it," which prompted the officers to conduct a search. In the car, the officers uncovered a handgun with an extended magazine underneath the driver's seat and a handgun magazine, digital scale, and $6,784 in cash in the center console. They also found an additional $912 in cash on Whitley's person and 692.5 grams (approximately a pound and a half) of marijuana in a black bag in the trunk of the vehicle.

Whitley told the police that he knew the gun was under the seat and that, if tested, his fingerprints would be on the gun and the ammunition. He also stated that he takes "donations" in exchange for marijuana.

**B. Procedural background**

Following the September 25, 2019 search of his vehicle, Whitley was indicted on the following three counts: (1) being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 921(a), 924(a)(2) (Count 1); (2) possessing with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) (Count 2); and (3) possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3). The charges were largely based on the evidence that was discovered during the search of Whitley's vehicle, evidence that Whitley unsuccessfully moved to suppress as the fruits of an unlawful search.

After the district court denied the motion to suppress, Whitley entered into a conditional plea agreement with the government, pleading guilty to Counts 2 and 3 of the indictment. Whitley reserved his right, "on appeal from the [district court's] judgment, to seek review of the adverse determination of the Defendant's Motion to Suppress Evidence." The court entered judgment against Whitley on Counts 2 and 3 of the indictment and sentenced him to 60 months' imprisonment followed by four years of supervised release. Whitley timely appealed the court's judgment, challenging the court's denial of his motion to suppress.

## II. ANALYSIS

**A. Standard of review**

When reviewing a district court's decision concerning a motion to suppress, we review findings of fact under the clear-error standard and review conclusions of law de novo. *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020). We must give "due weight to the factual inferences and credibility determinations" of the district court. *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (alteration in original) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)), *cert. denied*, 141 S. Ct. 1395 (2021).

**B. The officers abandoned the traffic stop, but had reasonable suspicion to continue detaining Whitley such that the stop did not violate the Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1986). Whether that seizure is reasonable, however, does not depend on "the actual motivations of the individual officers involved." *Id.* at 813. Rather, the reasonableness of the stop is contingent only upon whether "the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). A lawful traffic stop must therefore be limited in scope and duration. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). If an officer exceeds the scope or duration of the traffic stop, he must have "reasonable suspicion" to continue the stop on unrelated grounds. *Id.* at 354–55.

Based on this caselaw, our analysis will proceed in two parts. We first inquire whether the officers' entire engagement with Whitley should be deemed a traffic stop. Because we conclude that the officers abandoned the traffic stop and converted the stop into a drug investigation, we next analyze whether there was reasonable suspicion to engage in that new course of investigation.

### 1. *The officers abandoned the traffic stop*

"[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention" of traffic stops. *Id.* at 354 (citing *Arizona v. Johnson*, 555 U.S. 323, 327–28 (2009); *Caballes*, 543 U.S. at 406). Such unrelated investigations include questioning and dog sniffs. *Id.* But "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.*

at 354–55 (alteration in original) (quoting *Caballes*, 543 U.S. at 407).  In addition to determining whether to issue a ticket, an officer's "mission" during a traffic stop "includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (alteration in original) (quoting *Caballes*, 543 U.S. at 408).  In contrast, "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing[]'" lack "the same close connection to roadway safety as the ordinary inquiries" and therefore are "not fairly characterized as part of the officer's traffic mission."  *Id.* at 355–56 (second alteration in original) (citation omitted).

Three aspects of the Supreme Court's decision in *Rodriguez* guide our analysis of whether Officer Turmell and Detective Woollam had reasonable suspicion of illegal activity necessary to prolong the traffic stop.  First, *Rodriguez* expressly rejected the view that a "de minimis" intrusion or delay is permissible.  *Id.* at 353, 356–57.  Thus, post-*Rodriguez*, our prior caselaw permitting de minimis extensions of traffic stops is no longer good law.  *See e.g.*, *United States v. Everett*, 601 F.3d 484, 491–93 (6th Cir. 2010) (permitting de minimis extensions); *United States v. Cochrane*, 702 F.3d 334, 340–41 (6th Cir. 2012) (same).  Second, the Court rejected the government's argument that the relevant measure is whether "the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances."  *Rodriguez*, 575 U.S. at 357.  Instead, the Court made clear that "[t]he reasonableness of a seizure . . . depends on what the police in fact do."  *Id.*  Finally, the Court explained that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . .  but whether conducting the sniff prolongs—i.e., adds time to—the stop." *Id.* (internal quotation marks omitted).

We now turn to examining whether the officers' stop of Whitley remained within the proper duration and scope of a traffic stop.  Whitley has conceded that the initial traffic stop by the officers was permissible, so we need not evaluate whether the officers had probable cause to initially stop Whitley.  We will focus only on the questions and statements that the officers made after Whitley was pulled over.

Officer Turmell's initial questioning of Whitley was within the scope of the traffic stop because Officer Turmell informed Whitley that he had not come to a complete stop when leaving a private drive. Officer Turmell then requested Whitley's driver's license, automobile registration, and proof of insurance. Each of these questions is an ordinary inquiry incident to a traffic stop. The further questions of whether Whitley had anything illegal in the vehicle and where he was coming from are permissible only because Officer Turmell asked these questions during the time that Whitley was retrieving his license and registration. Thus, the questions "d[id] not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (quoting *Johnson*, 555 U.S. at 333).

Within a few seconds of receiving the requested documents, Officer Turmell noticed a scale in Whitley's lap and asked what the scale was for and if Whitley was going to buy weed. These questions were also unrelated to the traffic stop. But these two short questions came immediately after Officer Turmell noticed the scale while he still had Whitley's documents in his hands and was during the time "when tasks tied to the traffic infraction [were]—or reasonably should have been" ongoing. *See id.* at 354.

After Officer Turmell walked back to his cruiser and conferred with Detective Woollam, Whitley's detention objectively exceeded the relevant scope of the traffic stop because it was now entirely focused on Whitley's scale. The officers did not examine Whitley's documents, did not run his name through a database, and totally abandoned their investigation of the traffic violation. At that point, the traffic stop had morphed into a drug investigation, prompting Detective Woollam to say that they should pull Whitley out of his vehicle.

Officer Turmell then explained to Whitley that the officers wanted to "investigate the scale real quick." This explicit identification of the officers' purpose did not occur "during the supposedly dead time while [Officer Turmell] or another officer [was] completing a task related to the traffic violation"—a time during which an "officer may ask unrelated questions to his heart's content." *See United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020) (quoting *Everett*, 601 F.3d at 492). Rather, this interaction concerning the scale happened when both the officers were outside of the police cruiser and had left the materials relevant to the traffic stop behind.

Although in other contexts officers may require an individual to exit a vehicle as a safety precaution, *see, e.g.*, *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010), such "safety measures taken to facilitate a different investigation . . . are not tasks incident to the initial stop." *Lott*, 954 F.3d at 924. Even if asking Whitley to exit the vehicle is properly considered a safety measure, it is still a detour that requires independent reasonable suspicion because the request facilitated the investigation into the scale and did not pertain to the original traffic stop.

The district court determined that the officers had not abandoned the traffic stop because, "[d]uring the traffic stop, Officer Turmell was permitted to ask Whitley questions about the digital scale he observed on Whitley's lap." Although the court correctly concluded that Officer Turmell could ask Whitley about the scale within the confines of the traffic stop, the officers' subsequent actions constituted an abandonment of that investigation.

The district court, in rendering its decision, compared this case to *United States v. Lash*, 665 F. App'x 428 (6th Cir. 2016). *Lash* involved a traffic stop of a rental car that the driver had borrowed from his girlfriend. The officers performed a routine traffic stop in which they ran Lash's driver's license through a database, determined that it was valid, and noted that he did not have any outstanding warrants. As the officers were about to return Lash's license and let him go, however, one officer noticed a plastic bag sticking out from Lash's trousers. The officer testified that he then asked to see the car rental agreement "because he 'kind of wanted to investigate a little further, and that gave [him] time and opportunity to do so.'" *Id.* at 429–30 (alteration in original).

Had the officer in *Lash* not seen the bag, he said that "he 'likely' would not have issued Lash a traffic citation." *Id.* at 430. He then saw what appeared to be the butt of a gun inside of the bag and asked Lash to exit the vehicle. Lash refused and began to speed away, striking two officers in his flight before losing control of the vehicle. When officers subsequently searched the vehicle, they found a gun in the plastic bag. Asking to see a rental agreement is a "routine incidental request[]" normally permitted during a traffic stop. *Id.* at 431 (citing *United States v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009)). This court concluded that because the initial officer asked to see Lash's rental agreement before the officer had written a ticket, issued a verbal

warning, or even returned Lash's license, the traffic stop had not ended, and the officer's question about the rental agreement was within the scope of the initial traffic stop. *Id.*

In applying *Lash* to this case, the district court concluded that "[t]here are no facts in the record that indicate that the traffic stop ended" at the point when Officer Turmell asked Whitley about the scale or when the officers returned to Whitley's vehicle to ask him to exit because "Officer Turmell had not yet checked the status of Whitley's driver's license, written a ticket, issued a warning, or returned Whitley's driver's license." Because "the stop remained a routine traffic stop when the officers returned to Whitley's window," the court reasoned that the officers were permitted to ask Whitley to exit. The prolonged nature of the stop from that point on, according to the court, was attributable to "Whitley's own actions in refusing to exit the vehicle."

We disagree with the district court's analysis for two reasons. First, the rule that the court distilled from *Lash* is unworkable. The relevant inquiry is *not* whether the officers' detour from the traffic stop took place after the traffic stop was over. If there were a bright-line rule that a traffic stop does not end until an officer decides whether to issue a ticket and returns the driver's license, then an officer could withhold the ticket and the license indefinitely for the sake of pursuing another investigation. *See Rodriguez*, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . ."). Instead of asking *when* a detour took place, we look at "what the police in fact d[id]" and whether it related to the purpose of the traffic stop. *Id.* Thus, if the stopped party can show "*either* that the [police activity] was not 'tied to the traffic infraction' *or* that the traffic stop 'reasonably should have been' already completed," *Hernandez v. Boles*, 949 F.3d 251, 257 (6th Cir. 2020) (emphases added) (quoting *Rodriguez*, 575 U.S. at 354) then the traffic stop has been prolonged and independent reasonable suspicion is required.

Second, unlike in *Lash*, the officers in the present case explicitly stated that their purpose in continuing the stop was to "investigate the scale." This meant that the stop now became concerned with the scale and Whitley's possible drug-related activity. The officer in *Lash*, in contrast, never asked Lash questions that objectively exceeded the scope of the traffic stop. Even the officer's request that immediately preceded Lash's decision to flee—to review the rental agreement—was directly related to the traffic violation. We therefore conclude that this

case is unlike *Lash*, and that the officers here had abandoned the traffic stop to investigate Whitley's drug-related activities, an investigation that required a source of reasonable suspicion unrelated to the traffic stop.

### 2. *The officers had reasonable suspicion to continue the stop*

Because the officers abandoned their traffic-related investigation, an independent reasonable suspicion of unlawful activity beyond the traffic violation was required to lawfully continue the stop. *See Rodriguez*, 575 U.S. at 357–58 (remanding so that the district court could determine whether a dog sniff that came after an abandoned traffic stop was "independently supported by individualized suspicion"). We must therefore assess whether the officers had some "minimal level of objective justification" to continue detaining Whitley. *See United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (citing *Navarette v. California*, 572 U.S. 393, 396–97 (2014), and quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

To satisfy the reasonable-suspicion standard, an officer must put forth "more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 7, 27 (1968)). Reasonable suspicion, however, requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* "Reviewing courts must look to the totality of the circumstances of each case to see whether the detaining officer has a particularized or objective basis for suspecting legal wrongdoing." *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019) (internal quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The district court's "findings of historical fact" are reviewed under the clear-error standard. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). And a reviewing court must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," *id.*, as well as "considerable deference to the district court's credibility determinations," *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005) (citing *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003)).

Here, we conclude that the district court's findings of fact are supported by the record. We thus accept them as true for the purposes of resolving this appeal. The facts relevant to whether the officers had reasonable suspicion are as follows:

- Detective Woollam received information from a confidential informant about the sale of heroin at 5828 Ridgebrook Avenue in Kentwood, Michigan.

- Detective Woollam observed Whitley leave the home with a "wad of cash" that Whitley appeared to be counting.

- Whitley drove to a house down the street—5986 Ridgebrook—where he had an interaction, lasting less than 30 seconds, with another male.

- Detective Scott Drumm observed Whitley exit the Family Dollar without any purchases, take a black bag out of the passenger side of the vehicle, and place it in the trunk of the vehicle.

- Whitley then drove to the Mother Hubbard Liquor Store in Grand Rapids, entered the liquor store empty handed, and came out empty handed.

- During the traffic stop, which was initiated for failing to come to a standstill while exiting a private drive, Officer Turmell noticed a digital scale sitting in plain view on Whitley's lap.

- One of the officers observed marijuana "shake" on the dashboard of Whitley's vehicle.

The court must also give due weight to the district court's inferences and credibility determinations. Based on the testimony offered during the motion-to-suppress hearing, the court found credible "Detective Woollam's testimony about the 'wad of cash'" as well as "Detective Woollam's testimony about observing an interaction at 5986 Ridgebrook." But the court attributed limited value to Detective Woollam's testimony that the interaction amounted to a drug transaction. The court did infer, however, that the observed interaction "may be indicative of some relationship involving drugs." Finally, the court attributed minimal weight to Detective Woollam's testimony about the confidential informant because "there was no testimony or evidence presented to indicate that the informant had been previously reliable or that the tipster's information had been corroborated."

The relevant inquiry, however, is whether the totality of the circumstances presented above supports a conclusion that the officers had reasonable suspicion to believe that Whitley was engaged in illegal activity. In considering the totality of the circumstances, "[p]ertinent

circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (citations omitted).

This court, on previous occasions, has concluded that circumstances comparable to those in the present case gave rise to reasonable suspicion. For example, officers were deemed to have reasonable suspicion to believe that a car had "some connection to narcotic activity" where a "roll of cash" was found in plain view in the car's front seat and other suspicious activity had also been observed: the suspect was traveling to Miami for only two days, he used a name variation that eliminated the suspect's surname, and he failed to provide "documentation of any kind relating to" a legitimate business purpose of the trip. *United States v. Winfrey*, 915 F.2d 212, 213, 216–17 (6th Cir. 1990) ("While each factor by itself may be insufficient to establish reasonable suspicion that a crime was committed, articulable suspicion is based on an evaluation of *all* the surrounding circumstances as viewed by those trained in the law enforcement field." (emphasis in original) (citations omitted)).

This court also concluded that making "a series of brief stops" while driving and "manipulat[ing] objects on the floor of the car" after each stop was indicative of drug-trafficking activity. *United States v. Jones*, 75 F. App'x 334, 338–39 (6th Cir. 2003). Finally, possessing a scale is an additional datapoint weighing in favor of reasonable suspicion if other conduct suggestive of drug activity is observed. *See United States v. Frazier*, 249 F. App'x 396, 402 (6th Cir. 2007) (citing several decisions in which this court treated scales "as tools of the drug trade").

The officers in the present case observed Whitley entering and leaving a suspected drug house, counting a wad of cash, making a series of short stops, and moving a black bag from the passenger seat of his vehicle to the trunk. They also observed a digital scale sitting on Whitley's lap as well as what was believed to be marijuana residue on Whitley's dashboard. We conclude that these facts are comparable to those considered relevant to the reasonable-suspicion analysis in *Winfrey* and *Jones*.

Whitley raises several counterarguments.  He first argues that because the possession of marijuana or a marijuana accessory is lawful under the Michigan Regulation and Taxation of Marihuana Act (MRTMA), the presence of a scale on his lap, as well as his statements made during the stop that he smoked marijuana and was on his way to purchase marijuana, cannot give rise to reasonable suspicion.  To support his argument, Whitley analogizes his case to *Northrup v. City of Toledo Police Department*, 785 F.3d 1128 (6th Cir. 2015), in which this court held that an officer lacked reasonable suspicion to stop a man observed walking down the street in Ohio with a firearm because "Ohio law permits the open carry of firearms."  *Id*. at 1131.  But as Whitley concedes, *Northrup* "recognized that reasonable suspicion would have existed if the officer observed specific indicia of unlawful use," such as "carrying . . . an assault rifle or some other illicit firearm" that is not covered by Ohio's open-carry law.  *Id.* at 1132.  The scope of marijuana-related activity deemed lawful by the MRTMA is thus a relevant consideration.

Under the MRTMA, the possession, use, or transportation of up to 2.5 ounces of marijuana is considered a legal "permissive act."  Mich. Comp. Laws § 333.27955(1)(a).  But the MRTMA does not go so far as to legalize the distribution or trafficking of marijuana for remuneration.  § 333.27955(1)(d) (stating that "transferring *without* remuneration up to 2.5 ounces of marihuana" is a permissive act (emphasis added)).  This court's decision in *Northrup* stands for the proposition that, when an activity is deemed lawful by a state, that activity cannot give rise to reasonable suspicion standing alone.

The MRTMA goes further and provides that possessing or transporting no more than 2.5 ounces of marijuana "[is] not grounds for search or inspection."  *Id.* § 333.27955(1).  We read the statute to mean what it says:  under Michigan law, possessing a permissible amount of marijuana is not grounds for a search.  Officer Turmell and Detective Woollam would thus have been unable to rely solely on the marijuana shake on Whitley's dashboard to justify the search in this case.  We can, however, consider the scale, subject to the caveats that we explained in *Northup*. Although possessing a permissible quantity of marijuana cannot be grounds for a search, the MRTMA lacks a similar provision regarding marijuana accessories.  *Compare* Mich. Comp. Laws §333.27955(1) (the possession of 2.5 ounces or less of marijuana is "not grounds for search or inspection") *with id.* § 333.27955(2) (lacking similar language).

Whitley attempts to erode the officers' basis for reasonable suspicion by addressing each factual circumstance in isolation. He contends that the conduct and interactions observed by the officers—such as exiting a Family Dollar without any packages, placing a black bag in his trunk, entering and exiting a liquor store empty handed, or driving with a scale in his lap—were consistent with innocent behavior. Although "individual datapoints" might "portray entirely innocent conduct[,] . . . our cases teach that the overall scatterplot may give rise to reasonable suspicion." *United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) (citing *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). And that is the case here, where the totality of the circumstances establishes a factual basis upon which an officer could reasonably suspect that Whitley was engaged in unlawful drug activity.

Whitley's reliance on *United States v. Baro*, 15 F.3d 563 (6th Cir. 1994), and *United States v. Cervantes*, 19 F.3d 1151 (7th Cir. 1994), for the proposition that a wad of cash alone is not suspicious, does not advance his argument. The question before this court in *Baro* was whether the carrying of a large amount of cash through an airport established *probable cause* for the government to seize the currency, which poses a higher burden on the government than the reasonable-suspicion standard. 15 F.3d at 568. And the Seventh Circuit's decision in *Cervantes* actually cuts against Whitley's argument. The court in that case held that, "although a wad of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs *is* suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity." 19 F.3d at 1153 (emphasis in original).

To be clear, the wad of cash that Detective Woollam observed Whitley counting would not give rise to reasonable suspicion of drug activity standing on its own. But the cumulative effect of all the facts detailed above establishes that the officers had good reason to suspect that Whitley was engaged in the distribution or trafficking of either marijuana or heroin.

Whitley's final argument—raised for the first time in his reply brief—that the government forfeited its right to argue that the officers had reasonable suspicion to believe that Whitley was distributing drugs other than marijuana is also unavailing. We can affirm the denial of a motion to suppress on any grounds supported by the record. *United States v. Trice*, 966 F.3d

506, 512 (6th Cir. 2020) ("[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." (alteration in original) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019))), *cert. denied*, 141 S. Ct. 1395 (2021).  Here, the record supports the conclusion that the officers had reasonable suspicion that Whitley was engaged in drug trafficking, so they had an independent basis to continue the traffic stop regardless of the specific drug in question.

**C.  The officers had probable cause to search Whitley's vehicle**

We next address whether the officers had probable cause to conduct a warrantless search of Whitley's vehicle.  Once Whitley exited his vehicle, a drug-detection dog circled the vehicle and gave a positive alert for the presence of narcotics.  The question then is whether the officers had probable cause to search Whitley's vehicle based on the drug-detection dog's positive alert.  "The automobile exception permits officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'"  *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)).  A dog's positive alert to narcotics can serve as probable cause to search "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting."  *Florida v. Harris*, 568 U.S. 237, 246–47 (2013).

The record in the present case establishes that the drug-detection dog was certified, so the dog's positive alert was sufficient to establish probable cause.  This permitted the officers to conduct a warrantless search of Whitley's vehicle.  Accordingly, the evidence discovered during the search of the vehicle—ammunition, a Glock 19mm handgun with an extended magazine, over $7,600 in cash, a digital scale, and a pound and a half of marijuana, as well as Whitley's post-*Miranda* statements—were the fruits of a lawful search.

**III.  CONCLUSION**

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court.