NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0444n.06

Nos. 22-5083/5084

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| WILLIAM EUGENE KLAVER, | ) | **FILED**<br>Nov 03, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| HAMILTON COUNTY, TENNESSEE, | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| Defendant, | ) | |
| | ) | OPINION |
| DANIEL CAMERON WILKEY (22-5083) | ) | |
| and TYLER SHANE MCRAE (22-5084), | ) | |
| individually and in their capacities as Deputy | ) | |
| Sheriffs for Hamilton County, Tennessee, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Daniel Wilkey and Tyler McRae, deputy sheriffs from Hamilton County, Tennessee, stopped William Klaver for a tinted-window violation. They eventually requested a drug-sniffing dog because Klaver was shaking and refusing to say why. After the dog "alerted," the deputies searched Klaver's vehicle but found nothing illegal. Klaver then noted that he had muscular dystrophy. He now says that the officers unreasonably prolonged the stop without reasonable suspicion that he possessed drugs. When the historical facts are taken in the light most favorable to Klaver, we agree with the district court that the deputies violated clearly established Fourth Amendment law. So a jury must decide how to view those historical facts. We affirm.

I

On the evening of April 17, 2019, Klaver was traveling south toward Chattanooga. At 8:10 p.m., Wilkey pulled over Klaver's van because of its excessively tinted windows. Videos from the dash-cam on Wilkey's cruiser and from Klaver's phone captured their interactions over the next 40 minutes.

Wilkey told Klaver that he had stopped the van because its windows were "way too dark" and requested Klaver's license. Dash-Cam Video, R.233, 1:39–56. As Klaver searched for his license, Wilkey inquired about where Klaver was headed. Klaver's failure to respond led Wilkey to ask: "Not going to talk to me?" *Id.*, 2:02–06. Around this time, McRae pulled up and approached the van's passenger side. *Id.*, 2:03–04. After several more seconds, Wilkey asked Klaver, "You okay?" and again requested his license. *Id.*, 2:18–20. Klaver responded with a question of his own: "Am I being detained?" *Id.*, 2:23–25. Wilkey replied "yes" because of the "window-tint violation," and Klaver handed over his license. *Id.*, 2:25–40. As Wilkey and McRae headed back to Wilkey's cruiser, Wilkey said the words "sovereign citizen" to McRae. *Id.*, 2:49.

The officers talked for a few minutes. Wilkey observed that the van had an "obstruction" (a Marine Corps sticker) on its license plate and noted that Klaver had been "shaking like a leaf too." *Id.*, 2:52–3:18. He opined that they should "make sure he ain't got no pot or anything" because Klaver was "shaking like crazy." *Id.*, 3:38–41. When Wilkey suggested that they call for a drug-sniffing dog, McRae agreed because Klaver would "say no to a search." *Id.*, 3:42–57. A criminal-history review of Klaver revealed only "harassing phone calls back in '04." *Id.*, 3:52.

About five minutes into the stop, the officers returned to Klaver's van and requested his registration and insurance card. *Id.*, 6:12. As Klaver looked for the documents, Wilkey expressed appreciation for his military service but added that Klaver could not have an obstruction on his

2

license plate. *Id.*, 6:20–35. Wilkey then asked whether Klaver had "ever been arrested," to which Klaver replied "no." *Id.*, 7:08–09. Wilkey followed up: "Never ever?" *Id.*, 7:10–11. Klaver again said no. *Id.* So Wilkey turned to questioning whether Klaver was on any "kind of medication" (Klaver said no) or had "any kind of disability" (Klaver was silent). *Id.*, 7:13–18. Wilkey explained that the "reason I'm asking is 'cause you're shaking," and he inquired whether Klaver had "Parkinson's or anything like that?" *Id.*, 7:18–23. Klaver indicated that he did not think that Wilkey could ask him these questions. *Id.*, 7:25–30. Wilkey justified his questioning on the ground that Klaver's shaking might suggest that he was "hiding something" or had "drugs," so Wilkey asked, "You don't have any of that, do you?" *Id.*, 7:30–38. Klaver responded: "You know I don't." *Id.*, 7:37–38. A minute later, Wilkey again asked Klaver if he had "anything illegal in the car" like "weapons or anything like that." *Id.*, 8:11–16. Klaver again said no. *Id.*, 8:16–20.

At this point, Wilkey sought permission to search the van, but Klaver responded as anticipated: "I refuse permission for you to search my vehicle" and "there's nothing in here." *Id.*, 8:16–26. For a third time, Wilkey asked if Klaver had ever been arrested, and Klaver again replied "no." *Id.*, 8:27–30. Wilkey reiterated: "Is there any reason why you're shaking so bad?" *Id.*, 8:30–32. Klaver replied: "Sir, I'm trying to be as respectful as I can, [but] you've got me illegally pulled over." *Id.*, 8:31–39. Wilkey reiterated that he had legally stopped Klaver because of the window-tint violation and the "improper display" on the license plate. *Id.*, 8:38–54. Wilkey then confirmed that Klaver would not consent to a search. *Id.*, 8:53–55.

At 8:18 p.m., after the deputies returned to Wilkey's cruiser again, he requested a canine officer. *Id.*, 9:06–14. Dispatch informed him two minutes later that the officer was en route. *Id.*, 10:45–54. Wilkey filled out paperwork for the traffic ticket over the next several minutes, opining

3

to McRae that the van's windows were tinted so dark that you "can't see anything," not even the driver, and that Klaver had "done that for a reason." *Id.*, 11:38–50.

At 8:24 p.m., McRae approached Klaver. A few minutes before, Klaver started recording himself and can be seen peeling off the tint from the driver's side window. Phone Video 4, R.233, 0:55–1:08. Caught on Klaver's video, McRae asked Klaver if he had served in the Marines. *Id.*, 5:52–58. After nodding yes, Klaver noted that, while he did not mean to be "disrespectful," he would not "answer any more questions." *Id.*, 6:00–06. Klaver instead said that he would like to be "on my way" if they were not arresting him. *Id.*, 6:30–37. McRae noted that Wilkey was writing a ticket, but Klaver retorted that they needed a reason to detain him. *Id.*, 6:39–7:35. McRae once again described the window-tint and license-plate violations. *Id.*, 7:01–43. After expressing thanks for Klaver's service, he returned to Wilkey's cruiser. *Id.*, 7:45–49.

Wilkey continued filling out the ticket until the canine officer arrived at 8:32 p.m. Dash-Cam Video, R.233, 17:40–22:45. He told this officer that Klaver was likely a "sovereign citizen" who was "being combative" and "trying to conceal himself." *Id.*, 23:29–57. Wilkey added that the canine officer should let him "finish" with the ticket before deploying the dog in case Klaver "does something stupid." *Id.*, 24:00–04. After asking McRae about available court dates, Wilkey returned to the van and told Klaver to step out for the dog sniff. *Id.*, 24:21–26:08. Wilkey patted Klaver down and discussed the citation with him as the dog circled the van. *Id.*, 26:41–29:01. During the conversation, Klaver now claimed to Wilkey that "there's no tint on my driver's side window" (since he had removed it) and asked Wilkey to "go look" for himself. *Id.*, 28:09–26.

At 8:40 p.m., McRae told Wilkey (and an incredulous Klaver) that the dog had alerted to drugs in the van. *Id.*, 31:27–45. McRae and Wilkey searched the van for five minutes, finding nothing. *Id.*, 31:57–37:34. Wilkey asked Klaver a final time whether he had drugs; Klaver told

4

him again that he did not. *Id.*, 37:51–38:01. As Klaver signed the citation, he noted: "In case you were wondering, I have muscular dystrophy." *Id.*, 38:05–10. Wilkey replied: "That's all you had to say, sir." *Id.*, 38:10–25. Klaver drove off at 8:50 p.m. *Id.*, 40:35–41:15.

Klaver brought this pro se suit against Wilkey and McRae (among others). As relevant now, he alleged that the traffic stop violated the Fourth Amendment. Wilkey and McRae moved for summary judgment. The district court denied their motions on the ground that they had unreasonably prolonged the stop without reasonable suspicion that Klaver possessed drugs. Wilkey and McRae filed an immediate appeal on qualified-immunity grounds. We review the district court's decision de novo while construing any factual ambiguities in Klaver's favor. *See Beck v. Hamblen County*, 969 F.3d 592, 598 (6th Cir. 2020); *cf. Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

II

This qualified-immunity case has well-established ground rules. Klaver must show both that Deputies Wilkey and McRae violated the Fourth Amendment and that the existing caselaw clearly established this violation. *See Beck*, 969 F.3d at 598–99. The Fourth Amendment bars "unreasonable" "seizures." U.S. Const. amend. IV. The Supreme Court has read this phrase to prohibit officers from prolonging a traffic stop beyond the time necessary to investigate (and write a ticket for) a traffic violation unless the officers have reasonable suspicion that the stopped vehicle's occupants are engaging in other crimes. *See Rodriguez v. United States*, 575 U.S. 348, 354–56 (2015). This legal rule requires us to ask two questions in Klaver's case: Did Wilkey and McRae prolong the stop beyond the time necessary to resolve the window-tint violation? If so, did they have reasonable suspicion to believe that Klaver was engaging in other crimes?

*Question 1: Did the deputies prolong the stop?* When an officer stops a vehicle for a traffic violation, the officer generally may detain the driver only for the time necessary to complete the tasks associated with the reason for the stop. *See id.* at 354; *United States v. Whitley*, 34 F.4th 522, 529–30 (6th Cir. 2022). What are the tasks associated with a typical traffic stop? The Supreme Court has provided a checklist of duties that it found connected to an ordinary stop's purpose because they are designed to ensure that drivers are operating their vehicles "safely and responsibly." *Rodriguez*, 575 U.S. at 355. Officers usually will question a driver about the traffic infraction. They will run the driver's license and the vehicle's license plate in their computer. They will request and review the vehicle's registration and the driver's insurance. They will check for outstanding warrants. And, of course, they will write the traffic ticket if they decide to issue one. *See id.*; *United States v. Lott*, 954 F.3d 919, 924–25 (6th Cir. 2020). Officers also commonly question drivers about their travel plans. *See United States v. Cole*, 21 F.4th 421, 429–30 (7th Cir. 2021) (en banc) (citing cases); *see also United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012).

How about questions concerning whether the driver has drugs or weapons in the car? Or a walk of a drug-sniffing dog around the car to determine whether drugs might be inside? While these activities have no connection to the purpose of a typical traffic stop, the Supreme Court has nevertheless held that officers may engage in them during the time that they undertake the traffic-related tasks for the infraction that justified the stop. *See Rodriguez*, 575 U.S. at 354–55. So, for example, an officer can question a driver about drugs while the driver sorts through the glove compartment looking for an insurance card. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Whitley*, 34 F.4th at 530. And a canine officer may walk a dog around a car during the time that another officer completes a ticket. *See Illinois v. Caballes*, 543 U.S. 405, 406, 409 (2005).

Critically, however, this type of unrelated task turns a reasonable stop into an unreasonable seizure if it "'prolongs'—*i.e.*, adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357 (citation omitted); *see Stepp*, 680 F.3d at 663. And an officer may not avoid this rule by "slow walking" the traffic-related aspects of the stop to get more time to investigate other crimes. *See Whitley*, 34 F.4th at 531–32. Rather, once the traffic-related basis for the stop ends (or reasonably should have ended), the officer must justify any further "seizure" on a reasonable suspicion that the driver is committing those other crimes. *See Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020).

Here, then, we must ask whether Wilkey and McRae added time to the stop by investigating Klaver for drug possession. *See id.* at 256–57. Or said in the opposite way, we must ask whether their stop would have ended sooner if they had investigated Klaver only for tinted-window and license-plate infractions. This issue about what Wilkey and McRae would have done in the counterfactual world in which they had no drug-related concerns strikes us as a question about the "historical facts" that a jury should resolve when the evidence cuts both ways. *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018); *see Boles*, 949 F.3d at 257–58; *United States v. Howard*, 815 F. App'x 69, 75–76 (6th Cir. 2020); *cf. Gerics v. Trevino*, 974 F.3d 798, 802–06 (6th Cir. 2020).

In this case, moreover, the evidence cuts both ways. On the one hand, Wilkey testified that writing a citation and discussing it with a driver could take 30 minutes in an average case. Wilkey Decl., R.233-1, PageID 2198. Yet well under 30 minutes had elapsed between the time of the stop (8:10) and the arrival of the canine officer (8:32). Much of the deputies' questioning also occurred while Klaver himself delayed things by taking his time to hand over his registration and insurance card. *Cf. Howard*, 815 F. App'x at 75–76. Wilkey also continued to discuss the citation with

7

Klaver while the canine officer took his dog around the van, which suggests that the traffic-related aspects of the stop had still not come to an end even by that point. *Cf. Lott*, 954 F.3d at 924–25.

On the other hand, Wilkey and McRae spent several minutes questioning Klaver about his criminal past and the possibility that he had drugs or weapons in his van. *Cf. Stepp*, 680 F.3d at 663. Perhaps they could have been completing the ticket during this time? The canine officer also did not just happen to drive by the stop. Rather, Wilkey called the officer precisely because he "want[ed] to make sure [that Klaver] ain't got no pot or anything"—in other words, because he was investigating criminal conduct unrelated to the traffic stop. Dash-Cam Video, R.233, 03:42. Wilkey and McRae also waited some 14 minutes for the canine unit to arrive. *Id.*, 9:14 (call), 23:15 (arrival). During this delay, Wilkey even asked McRae: "you seen [the canine officer] yet?"—a question that could suggest the deputies had been dragging things out to give this officer more time to arrive. *Id.*, 21:15–16.

Wilkey and McRae respond that they are at least entitled to qualified immunity because no clearly established legal rule gave them "fair notice" that their stop lasted too long under the circumstances. *Gambrel v. Knox County*, 25 F.4th 391, 400 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam)). Yet the Supreme Court has adopted a "bright-line rule" that officers may not detain a driver for longer than necessary to complete a traffic stop simply because they want to investigate other crimes. *Boles*, 959 F.3d at 256; *see Rodriguez*, 575 U.S. at 354–57. Under Klaver's view of the facts here, Wilkey and McRae did just that. Indeed, the deputies do not really contest the "*law*": they do not dispute that if they extended the stop longer than they needed for the traffic infractions, *Rodriguez*'s rule would apply. *Gambrel*, 25 F.4th at 404. Rather, they contest the "*facts*": they claim that they did not extend the

stop. *Id.* The legal defense of qualified immunity does nothing to insulate this factual dispute from the jury. *Id.* at 400 (citing *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam)).

McRae also criticizes the district court for failing to analyze his conduct independently of Wilkey's. McRae is correct that we may not hold him liable for Wilkey's conduct on a vicarious-liability theory; he instead must have personally participated in the allegedly illegal seizure. *See Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020). But a reasonable jury could find that he did. Among other evidence, McRae arrived just a minute after the stop and recommended that they run a "tag match" of the van. Dash-Cam Video, R.233, 2:52–3:03. McRae also agreed that they should call a canine officer because Klaver would "say no to a search." *Id.*, 3:47–50. And while McRae questioned Klaver alone, he reiterated that they were still properly detaining him due to the tag obstruction and tinted windows. Phone Video 4, R.233, 7:10–37.

*Question 2: Did the officers have reasonable suspicion to prolong the stop?* Because a jury could reasonably find that Wilkey and McRae prolonged the stop, they would violate the Fourth Amendment under Klaver's version of the facts unless they had "independent reasonable suspicion" for that extended seizure. *Boles*, 959 F.3d at 256; *see United States v. Sheckles*, 996 F.3d 330, 344–45 (6th Cir. 2021). The reasonable-suspicion test is not a particularly "demanding" one. *See Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). It sets a lower standard than probable cause, which itself does not set a "high bar." *Sheckles*, 996 F.3d at 343 (citation omitted).

To have reasonable suspicion here, the deputies needed a "particularized" belief (that is, one tied to Klaver) and an "objective" belief (that is, one tied to articulable facts rather than amorphous hunches) that Klaver possessed drugs. *See Glover*, 140 S. Ct. at 1187 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). We look to the totality of the circumstances available to the deputies when they acted to decide whether they met this test. *See Cortez*, 449

U.S. at 417–18. And we review the district court's ultimate reasonable-suspicion conclusion de novo, but we again must construe any underlying questions about the historical facts in Klaver's favor at this summary-judgment stage. *See Ornelas v. United States*, 517 U.S. 690, 696–99 (1996).

Wilkey's and McRae's briefs identify four pieces of evidence as their grounds for reasonable suspicion to believe that Klaver possessed drugs: (1) the deputies suspected that Klaver might be a sovereign citizen; (2) Klaver removed the tint from his window and lied about doing so during the stop; (3) Klaver was shaking; and (4) he was generally uncooperative and did not respond to the officers' questions about the shaking. Wilkey Br. 19–24; McRae Br. 19. The deputies have not argued that the excessive tint or obstructed license plate could also help create a reasonable suspicion that Klaver was transporting drugs, so we need not consider those grounds. And while we must avoid a "divide-and-conquer analysis" that examines their four factors "in isolation from each other," *United States v. Arvizu*, 534 U.S. 266, 274 (2002), we do not think the first two factors should go into the reasonable-suspicion calculus at all on the facts of this case.

To begin with, we may reject the deputies' first factor—Klaver's sovereign-citizen status—based solely on the conclusory fashion in which they have presented it to us. The deputies believed that Klaver might be a sovereign citizen (an individual known to be "uncooperative") because he asked if they were detaining him and hesitated before providing his license. McRae Decl., R.233, PageID 2210–11; Wilkey Decl., R.233, PageID 2197. Yet the video shows that Klaver was reasonably polite, not loudly confrontational. Unless everyone who is reluctant to speak with the police might be a "sovereign citizen," the deputies' claim appears to have rested more on a "subjective hunch" than objective facts. *Hoogland v. City of Maryville*, 2022 WL 1773416, at *7 (6th Cir. June 1, 2022). Even more critically, they do not identify a single judicial decision or evidentiary citation suggesting that a suspect's "sovereign citizen" status correlates with the *type*

of criminal activity suspected here. *Cf. El v. AmeriCredit Fin. Servs., Inc.*, 710 F.3d 748, 750 (7th Cir. 2013). They have thus not shown enough for this factor to have relevance.

In addition, we may reject the deputies' second factor—that Klaver removed the window tint and lied about doing so—because it is not clear that they knew of this conduct when they allegedly decided to extend the stop. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000). Klaver removed the window tint around 8:20 p.m., after Wilkey had already called for the canine officer. Phone Video 4, R.233, 0:55–1:05. Klaver also engaged in this conduct outside the deputies' presence and immediately rolled his window back down, so it is not clear when the deputies even learned that he had done so (they may have learned of Klaver's actions only later after he posted his cellphone videos of the stop on YouTube). Klaver's subsequent false statements about the window tint likewise came near the end of the stop, well after the deputies had (allegedly) prolonged it. Dash-Cam Video, R.233, 28:09–26. Because we assess reasonable suspicion based on the facts that the officers knew at the time that they prolonged the seizure, these unknown facts likewise cannot go into the reasonable-suspicion calculus at this stage. *See J.L.*, 529 U.S. at 271.

These two conclusions leave only Klaver's shaking and refusal to cooperate. Wilkey and McRae noticed immediately that Klaver was "shaking like crazy." Dash-Cam Video, R.233, 3:42. At that early point, Wilkey opined that they should "run a dog around him" to "make sure he ain't got no pot or nothing." *Id.* Yet what about Klaver's shaking suggested that he might be committing a crime? There are two ways to look at this question.

Perhaps the shaking suggested that Klaver was nervous because he "was in possession of [an] illicit substance." Wilkey Decl., R.233-1, PageID 2197. Yet many law-abiding people show their nerves in the same way when confronted by the police. *See United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004). So we have always given nervous shaking little "weight,"

11

*Howard*, 815 F. App'x at 77, and have said that it amounts to a "weak" indicator of crime, *United States v. Calvetti*, 836 F.3d 654, 665 (6th Cir. 2016); *see also United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015); *Stepp*, 680 F.3d at 665; *United States v. Johnson*, 482 F. App'x 137, 145 (6th Cir. 2012); *United States v. Samuels*, 443 F. App'x 156, 161 (6th Cir. 2011); *United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009); *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008); *Richardson*, 385 F.3d at 630–31. We have relied on this factor only when a suspect "was exhibiting visible signs of nervousness beyond" the usual level in traffic stops and only in combination with other more suspicious factors. *United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013); *see United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016).

Or perhaps the shaking was so unusual that it suggested that Klaver might be an "impaired" driver (not just a nervous one) who would threaten others on the road. Wilkey Decl., R.233-1, PageID 2197. Certainly officers may detain a driver for things like questioning or field-sobriety tests if they have a reasonable suspicion that the driver is, for example, operating a vehicle under the influence of drugs. *See, e.g.*, *United States v. Guajardo*, 388 F. App'x 483, 488–89 (6th Cir. 2010); *see also Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012). And qualified immunity does protect officials who make mistakes of fact, such as a mistake about whether a suspect is impaired. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). But Wilkey and McRae mention this theory only in passing. And they frame Klaver's shaking as giving rise to a mistake of *law*—whether Klaver was shaking so severely as to create reasonable suspicion of impairment.

We cannot answer this legal question now because of a dispute in the historical facts over the nature of the shaking. The dash-cam video did not record it. *Cf. Green*, 681 F.3d at 861–62. And the summary-judgment record contains mixed evidence over whether Klaver's shaking resembled the "trembling hand" of a nervous driver, *Richardson*, 385 F.3d at 630, or the impaired

hand of an incapacitated one. Although, for example, the deputies conclusorily testified that they thought Klaver might be impaired (and he did in fact have a disease that affected his mobility), they did not require him to take field-sobriety tests or even question him about his ability to drive the van. Taking the facts in the light most favorable to Klaver, a jury could find that the deputies could have reasonably concluded only that Klaver was nervous.

Apart from his nervousness, the officers lastly highlighted Klaver's reluctance to cooperate or respond to questions, including about why he was shaking. Yet a suspect generally does not have a duty to cooperate, and so the lack of cooperation does not alone provide reasonable suspicion to believe that the suspect is committing a crime. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). At the same time, we have recognized that a suspect's vague or nonresponsive answers can bolster a reasonable suspicion that primarily rests on other factors. *See United States v. Smith*, 594 F.3d 530, 541 (6th Cir. 2010). Here, however, Klaver largely cooperated. He answered most of the questions put to him— sometimes more than once—such as whether he had ever been arrested, whether he had taken any medication, and whether he had drugs or contraband in the van. In fact, he refused to answer only two questions before McRae and Wilkey called for the dog: where he was going and whether he had a disability.

In sum, when we review the evidence in the light most favorable to Klaver, Wilkey and McRae lacked reasonable suspicion that Klaver was committing other crimes. A suspect's nervousness and refusal to cooperate have played only *minor* roles in our other reasonable-suspicion decisions. *See, e.g.*, *Calvetti*, 836 F.3d at 666–67; *Stepp*, 680 F.3d at 665. Putting the two together does not lend the deputies a *major* justification for reasonable suspicion.

That may be true, the deputies respond, but they are at least entitled to qualified immunity on this reasonable-suspicion question. Once again, however, our clearly established caselaw would have left no doubt for any reasonable officer that Klaver's nervousness and reluctance to cooperate did not create reasonable suspicion, absent additional evidence of criminal activity. *See Gambrel*, 25 F.4th at 400. We have a mountain of caselaw indicating that heightened nerves represent weak evidence of wrongdoing and cannot be the primary justification for a stop. *See Winters*, 782 F.3d at 299 (citing cases). Consider *Richardson*. There, an officer stopped a car for a traffic violation and noticed that all of the passengers were nervous, including the driver who handed over his license with a shaking hand. 385 F.3d at 627. Yet this fact did not suffice to create a reasonable suspicion of wrongdoing, even when combined with other factors like the occupants' "conflicting explanations of their travel plans[.]" *Id.* at 630–31; *see Urrieta*, 520 F.3d at 577; *see also Johnson*, 482 F. App'x at 145.

The caselaw on which the deputies rely reinforces this point. Wilkey cites *United States v. Ellis*, 497 F.3d 606 (6th Cir. 2007). But the traffic stop there lasted "only twenty-two minutes" before the driver gave consent to a search. *Id.* at 613. And it is not clear that the traffic-related purposes for the stop in *Ellis* ever came to an end because the defendant, a passenger in the car, had given a "false alias" that the officer "was unable to confirm" before the search. *Id.* at 614. A reasonable jury in this case, by contrast, could find that the stop's traffic-related purposes would have ended well before the dog sniff if the officers had not been investigating drug crimes.

McRae cites *Lott*. In that case, however, the officer had reasonable suspicion to continue the stop because the driver admitted that he had marijuana. 954 F.3d at 922. Klaver, by contrast, adamantly and consistently denied that he possessed drugs.

We affirm.

14